**CITY OF FRESNO, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**No. CV–F–06–1559–OWW–TAG.**

United States District Court, E.D. California.

April 22, 2010.

Opinion Denying Reconsideration June 30, 2010.

Jessica E. Yates, PHV, Snell and Wilmer L.L.P., Denver, CO, Lisa A. Decker, Jeffrey L. Willis, Snell & Wilmer LLP, Tucson, AZ, for Plaintiff.

Francis Malcolm Goldsberry, II, Goldsberry Freeman and Guzman, LLP, Sylvia Ann Quast, United States Attorney's Office, Sacramento, CA, Charles Scott Spear, Govt., U.S. DOJ, ENRD, Environmental Defense Section, Kim Noelle Smaczniak, Govt., United States Department of Justice, Paul Cirino, Environmental Defense Section, U.S. Department of Justice, Washington, DC, for Defendants.

MEMORANDUM DECISION RE: DEFENDANT'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS OR FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF'S RCRA CLAIM; MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS AS TO PLAINTIFF'S HSAA CLAIM (Docs. 142 & 143).

OLIVER W. WANGER, District Judge.

## I. INTRODUCTION.

This is a dispute over environmental remediation between Plaintiff City of Fresno (the "City") and Defendants the Boeing Company ("Boeing"), the United States Army Corps of Engineers, and the National Guard Bureau (collectively, the "United States"). The dispute concerns the environmental remediation of Old Hammer Field ("OHF") in Northeast Fresno, a site presently occupied by the Fresno–Yosemite International Airport. This site was used by the United States as an Army Air

base during World War II. In 1946, the United States transferred the property to Plaintiff, which has since owned and controlled it. Boeing's predecessor, North American Aviation, was one of Plaintiff's tenants of the property in the 1950s.

The City of Fresno has sued the United States and Boeing in a Second Amended Complaint ("SAC") under CERCLA, RCRA, HSAA, as well as various state law theories. Plaintiff alleges that it "has shouldered, and continues to shoulder, a disproportionate share of the past, present and ongoing costs associated with the investigation and clean up of the OHF property, as well as off-site areas affected by Defendants' polluting activities." (SAC ¶ 4.) Plaintiff requests a "declaration of responsibility and payment from Defendants for their fair share of all past, present and future responses costs [sic] incurred in response to Defendants' release of hazardous substances, wastes, materials and pollutants." (Id. ¶ 6.) Plaintiff also seeks monetary and injunctive relief.[1]

Before the court for decision are two motions brought by Defendant United States: (1) for partial judgment on the pleadings or partial summary judgment as to Plaintiff's fourth claim under the RCRA; and (2) for partial judgment on the pleadings as to Plaintiff's third claim under the HSAA.

Defendant's RCRA motion challenges subject matter jurisdiction over this claim under § 113(h) of CERCLA. Defendant also argues that the claim is moot because the activities Plaintiff seeks to enjoin are already underway, under the doctrine of primary jurisdiction, and because there is no imminent and substantial endangerment at OHF as required under Plaintiff's RCRA claim. The HSAA claim is allegedly infirm because the United States has not unequivocally waived its sovereign immunity.

These motions were originally filed on April 23, 2007 and renoticed on August 20, 2009. Although the arguments in the original motions and renewed motions are largely the same, there is one important distinction: Plaintiff now alleges that 1, 2, 3–trichloropropane ("TCP") has leached into the City's water supply, allegedly from the federal facilities located on or near OHF. The alleged presence of TCP—and its effect on the current remediation plan—drives the current dispute.

## II. FACTUAL/PROCEDURAL BACKGROUND.

This case involves the cost, scope, and progress of environmental remediation activities conducted by Plaintiff City of Fresno, Boeing, and the United States at Old Hammer Field ("OHF"), a site presently occupied by the Fresno–Yosemite International Airport. This site was used as an Army Air base during the World War II years.[2] Boeing's predecessor, North American Aviation ("NAA"), was one of Plaintiff's tenants of the property in the 1950s.

The State of California, through its Department of Toxic Substances Control ("DTSC") and the Regional Water Quality Control Board ("RWQCB") ("State Agencies") has oversight over the cleanup. The parties work together as the Old Hammer Field Steering Committee and have entered into multiple agreements since 1993,

---

1. Specifically, Plaintiff seeks a "preliminary injunction and permanent injunction directing Defendants [...] to investigate and remediate completely the contamination on, under, adjacent to or downgradient from OHF and the surrounding areas in an expeditious manner." (Doc. 123–3.36:24–36:27.)

2. The majority of the work at OHF focuses on a 78–acre parcel known as "Area 1." (Weston Dec., ¶ 5.) Area 1 was historically the location of the most intense industrial activity, both during and after World War II. (Id.)

including a 1993 Cost–Sharing Agreement containing an interim allocation of costs and specification of remedial tasks to be performed.[3] On October 4, 1994, Plaintiff, the United States, and the State Agencies entered into a Potentially Responsible Party Agreement for Old Hammer Field ("Cooperative Agreement") governing the performance of the investigation and response actions at the site. On the same date, DTSC issued an Imminent or Substantial Endangerment Order and Remedial Action Order for OHF to Rockwell International, a successor to NAA and one of Boeing's predecessors.

In May 2004, the State Agencies approved the Final Remedial Action Plan ("RAP") for OHF, which was a result of the Cooperative Agreement process. The RAP identified two primary contaminants of concern. First, a chlorinated volatile organic compound ("VOC") known as trichloroethene ("TCE"), which has been used as a degreaser and industrial solvent for many industrial activities. The TCE plume extends almost 12,000 feet long, up to 4,000 feet wide at points, and up to 300 feet deep at points. It is suspected to have originated from Area 1. Second, tetrachloroethene ("PCE"), another industrial solvent, is contained within the larger TCE plume. The RAP has five principal components: (1) the Water Supply Contingency Plan; (2) the operation and treatment of water from Well 70; (3) the treatment of the "source area"; (4) installation of wells to prevent downgradient migration of contaminants; and (5) the operation and maintenance of the system.[4]

None of the parties is satisfied with the interim allocation of money each has paid over the years under the Cost–Sharing Agreement. Each believes it is entitled to reimbursement from the other parties. Nonetheless, until August 2006, the cleanup had continued without interruption with funding from the parties identified in a series of amendments to the original Cost–Sharing Agreement. In early 2006, disputes about funding arose and while alternative proposals were discussed, the parties were unable to agree on the allocation of funds. With funding exhausted, in August 2006 the parties notified the State Agencies that the remediation work at OHF would stop because of funding disagreements.

In September 2006, DTSC determined Plaintiff and the United States were non-compliant with the Cooperative Agreement and that Boeing was non-compliant with the DTSC's October 1994 Order. On October 20, 2006, pursuant to the California Water Code, the RWQCB issued an order to all of the parties to comply with a groundwater monitoring and discharging program. On October 31, 2006, pursuant to the California Health and Safety Code, DTSC issued an Imminent or Substantial Endangerment Determination and Order and Remedial Action Order to all the parties to conduct various response actions in accordance with a specific timeline. The DTSC Order required all parties, unilaterally, jointly, and severally, to immediately ensure that all required activities under the OHF RAP moved forward in accordance with the enforceable schedule. In December 2006 the parties reached an agreement to fund the activities required by the State Agencies in their October 2006 orders in the form of Amendment 8 to the Cost–Sharing Agreement.

---

**3.** The Steering Committee retained consultant ERM West, Inc. to perform most of the remedial work at OHF. (White Dec., Doc. 45–3, ¶ 9.)

**4.** The RAP originally included a sixth principal component, the "Pre–Design Investigation the Southeast Plume Source Area," but it was determined—based on a review of the samples—that the remediation systems were sufficient.

On November 2, 2006, Plaintiff filed this action seeking payment for response costs it has incurred in relation to the cleanup at OHF of contaminants released by Defendants. The City sought a declaration of responsibility for past, present and future response costs incurred at OHF, as well as damages and injunctive relief to remediate the harm caused to OHF. Plaintiff originally pled twelve causes of action: a) Claims One and Two against all Defendants for equitable contribution under CERCLA section 107(a) and section 113(f) contribution, respectively, b) Claim Three against all Defendants for contribution and indemnity pursuant to HSAA, Cal. Health and Safety Code § 25363(e) and treble damages under § 25398.17, c) Claim Four against all Defendants for injunctive relief and litigation costs pursuant to RCRA § 6972, d) state law claims against Boeing, Claims Five through Eleven, for continuing nuisance, public nuisance, negligence, negligence per se, continuing trespass, waste, and equitable indemnity and contribution, and e) Claim Twelve for declaratory relief, seeking a judicial determination of the parties' respective liabilities for the OHF cleanup.

On April 23, 2007, Defendant United States moved for partial judgment on the pleadings or partial summary judgment on Plaintiff's RCRA claim and for partial judgment on the pleadings as to the HSAA claim. The City opposed the motion and the parties appeared before the Court on December 3, 2007 for oral argument on Defendant's motions. The case was subsequently stayed pending settlement negotiations. On April 17, 2009, the stay was lifted and Plaintiff was ordered to file an amended complaint. (Doc. 122.)

Plaintiff filed a Second Amended Complaint on May 18, 2009, advancing twelve causes of action, including claims under RCRA and HSAA. (Doc. 123–3.) Defendant United States filed a "Notice of Renewal of Pending Dispositive Motions" on August 7, 2009. The unopposed motion was granted on August 12, 2009.

On August 20, 2009, the United States renoticed its motion for partial judgment on the pleadings or partial summary judgment on Plaintiff's RCRA claim:

> This motion will be based on this Notice of Motion and Motion, the Statement of Undisputed Material Facts, the Memorandum of Points and Authorities, the Declaration of Linda J. White, the Declaration of Rick Weston, and accompanying exhibits, all of which have been previously filed [on April 23, 2007], all the papers and pleadings on file in this matter, and on such argument of counsel and additional evidence as may be considered at the hearing.

> The previously filed Memorandum of Points and Authorities contains arguments and references relating to the First Amended Complaint. Such arguments and references are equally applicable to the Second Amended Complaint, filed June 9, 2009, which contains allegations that, in all respects material to this motion, are identical to the corresponding allegations of the First Amended Complaint.

(Doc. 142.[5])

The City opposed the United States' motions on September 14, 2009.[6] In con-

---

**5.** The United States also incorporates its earlier filings in conjunction with its motion for partial judgment on the pleadings on Plaintiff's HSAA claim. (Doc. 143.)

**6.** Similar to Defendant, the City "incorporates in their entirety the points and arguments raised in its Opposition to the United States' Motions filed [ ] on May 7, 2007 and raised in oral argument on December 3, 2007." (Doc. 150, 1:27–2:2.) The City also filed supplemental oppositions. (Docs. 150 & 151.)

nection with its opposition, the City has filed a number of exhibits and declarations, including the declaration of Lisa Decker, counsel for the City.

## III. *LEGAL STANDARD*

Defendant moves for partial judgment on the pleadings or partial summary judgment. Judgment on the pleadings is appropriate if, assuming the truth of all material facts pled in the complaint, the moving party is nonetheless entitled to judgment as a matter of law. *Hal Roach Studios v. Richard Feiner & Co., Inc.,* 896 F.2d 1542 (9th Cir.1989). Under Rule 12(c), if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *MetroPCS, Inc. v. City and County of San Francisco,* 400 F.3d 715, 720 (9th Cir.2005). Here, the United States provides two declarations with numerous supporting documents as evidence in support of its RCRA arguments. Because Defendant relies on matters outside the pleadings, its RCRA motion cannot be resolved under Rule 12(c). Accordingly, the RCRA motion is treated as a motion for summary judgment. The United States, however, does not rely on matters outside the pleadings to support its HSAA motion, therefore it is analyzed under Rule 12(c).

### A. *Summary Judgment*

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007). With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the non-moving party's case." *Soremekun,* 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Soremekun,* 509 F.3d at 984. (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *FTC v. Stefanchik,* 559 F.3d 924, 929 (9th Cir. 2009). "[A] non-movant must show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in his favor." *Id.* (emphasis in original). "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In determining whether a genuine dispute exists, a

district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505.

### B. *Judgment on the Pleadings*

A party may move for judgment on the pleadings after the pleadings are closed but early enough not to delay trial. Fed. R.Civ.P. 12(c). When a Rule 12(c) motion challenges the sufficiency of the pleadings, the standard for such a motion is similar to the standard for a Rule 12(b)(6) motion in that judgment on the pleadings is appropriate when, even if all the allegations in the complaint are true, the moving party is entitled to judgment as a matter of law. *Milne ex rel. Coyne v. Stephen Slesinger, Inc.,* 430 F.3d 1036, 1042 (9th Cir.2005). In such cases, the court assumes the allegations in the complaint are true and construes those allegations in the light most favorable to the plaintiff. *McGlinchy v. Shell Chemical Co.,* 845 F.2d 802, 810 (9th Cir.1988). Conclusory allegations, however, without more are insufficient to defeat a Rule 12(c) motion. *Id.*

## IV. *DISCUSSION*

The United States seeks judgment on two of the claims contained in the SAC. First, the United States seeks summary judgment on Plaintiff's fourth claim under RCRA. Second, the United States seek judgment on the pleadings on Plaintiff's third claim under the HSAA.

### A. *Preliminary Issues*
### 1. *Declaration of Robert Dworkin*

To support the substance of its RCRA arguments, particularly those relating to "mootness," the City contends that at an August 2009 deposition, Mr. Robert Dworkin, a FUDS Program Manager, acknowledged that the Corps had not requested funding for the OHF cleanup in its 2009–2010 budget. According to the City,

"[g]iven that the point of the City's RCRA claim is to require the United States to actually fund its commitment to clean up OHF," the RCRA claim cannot be moot in light of the United States' testimony.

In response, the United States submitted the sworn declaration of Robert J. Dworkin, which clarified his August 2009 remarks:

> During my deposition in this action on August 27, 2009, I testified that, at that time, the Corps had not budgeted any funds for the remediation of Old Hammer Field for Fiscal Year 2010, which extends from October 1, 2009 through September 30, 2010. I testified that the budgeting process was not yet completed and that there was still an opportunity for FUDS to be budgeted for the Old Hammer Field cleanup.

> After the deposition, and despite Plaintiffs previous withdrawal from settlement negotiations, it was requested and the Corps agreed to reprogram, from FUDS that had been assigned to other remediation projects, approximately $300,000 that will be made available in increments of approximately $100,000 per quarter for the first three quarters of Fiscal Year 2010. It is the Corps' understanding that this will cover the Agency's share of expenses under the terms of the previous cost share agreement for the coming year.

> The funding described above will be made available subject to normal restrictions on federal agency funding such as the Anti–Deficiency Act. It should also be noted that the Department of Defense and the U.S. Army Corps of Engineers are currently operating under a Continuing Resolution Act at the moment which severely constrains DOD funds until such time as the Federal

Government completes the DOD appropriations process for Fiscal Year 2010. (Doc. 167–2, Dworkin Dec., ¶'s 3–5.)

Mr. Dworkin's sworn declaration resolves many of the arguments raised in the City's motion, particularly as they relate to funding for the Corps' 2009–2010 budget.[7]

### 2. *Current Status of Cleanup*

The OHF is the subject of ongoing remediation efforts. In 1994, the City, the United States, and Boeing signed a cooperative agreement outlining the investigation, cleanup, and response actions at the OHF site. In 2004, the stage agencies approved the final RAP for the OHF site. In October 2006, following a dispute among the parties, the DTSC issued an "Imminent or Substantial Endangerment Determination and Order" requiring all parties to unilaterally, jointly, and severally conduct all required activities in accordance with an enforceable schedule. In December 2006 the parties reached an agreement to fund the remediation activities required by the DTSC's October 2006 order in the form of Amendment 8 to the Cost–Sharing Agreement. As best understood, the remediation efforts are continuing under Amendment 8.

The declaration of Lisa Decker provides an update:

15. Since briefing and argument on the United States' Motion in 2007, the City has continued to contribute to the clean up efforts. The City has paid a total of $3,632,771 of $14,576,692 in clean up costs, or 25 percent of the costs thus far. The

United States and Boeing have paid the remainder.

(Decker Dec., Doc. 152, ¶ 15.)

Although the parties are not satisfied with scope and duration of funding, particularly as to the federal budgeting process, there has not been a formal breach of the cooperative agreement.[8]

### B. *RCRA (Claim IV)*

The "RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) (citing *Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 331–32, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994)). Its purpose is to minimize the present and future threat to human health and the environment, not effectuate the clean-up of toxic waste sites or allocate those costs. 42 U.S.C. § 6902(b); *Meghrig*, 516 U.S. at 483, 116 S.Ct. 1251. The RCRA provides for citizen suits to obtain a "mandatory injunction, i.e., one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, i.e., one that 'restrains' a responsible party from further violating RCRA." *Id.* at 484, 116 S.Ct. 1251.

Specifically, citizens can sue for injunctive relief to enforce RCRA's provisions:

against any person, including the United States, ... who has contributed or who is contributing to the past of present

---

7. The history of funding of the OHF cleanup is that budgeting and approval of the annual cleanup costs is not completed and paid until the end of the applicable year. The United States' share has been paid every year.

8. At oral argument on March 22, 2010, the Court clarified: "And the Court does not understand there to be a current breach, although it is always the case that federal fund-

ing, the federal government more often than not operates under continuing resolutions. There is always—because of the nature of the federal FIFG [sic] and the budgeting process under the law, if you will, delay involved in the ultimate approval authority. But there hasn't been one year that the funding hasn't been approved and paid." (Reporter's Transcript ("RT"), March 22, 2010, 12:8–12:15.)

handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B).

The SAC seeks an injunction compelling Defendants to "correct the violations, including, but not limited to, investigating, remediating, responding to, and removing the contamination released from OHF, and for other actions as may be necessary to remedy the violations committed by Defendants." (SAC ¶ 133.)

The United States contends that the City's RCRA claim fails for four reasons: (1) the court lacks subject matter jurisdiction over this claim pursuant to § 113(h) of CERCLA, (2) the claim is moot because the City is asking the court to engage in an idle act as the United States is in compliance with the remedial objectives of the DTSC pursuant to the RAP; (3) under the primary jurisdiction doctrine, the administrative forum provided by the State of California is the appropriate forum for resolution of the City's claims concerning the cleanup of the OHF; and (4) there is no imminent and substantial endangerment at OHF as required by the RCRA framework.

Plaintiff rejoins that a number of factual developments preclude summary judgment, chief among them that "the City has now determined that [...] TCP has leached into the City's water supply from OHF." (Doc. 150, 2:7–2:10.) According to the City, because the current remediation efforts do not address TCP, each argument raised by the United States is unavailing.[9] Even without the TCP allegations, the City argues that summary judgment is inappropriate because the United States has failed to obtain or commit sufficient funds to continue the cleanup at OHF.

The United States responds that the funding of the cleanup and the alleged introduction of TCP are irrelevant to the issues raised by its motion for three reasons. One, absent a showing of "substantial and imminent danger to health or the environment," Plaintiff's TCP allegations have no legal effect. Two, the DTSC has not ordered the parties to address TCP, therefore the United States is under no obligation to budget or spend money to remediate TCP from the OHF site. Three, the fact that small amounts of TCP were allegedly detected in some city and county well "is irrelevant to whether the Court has subject matter jurisdiction over the RCRA claim."

### 1. *CERCLA § 113(h)*

■ The substance of the United States' motion focuses on the jurisdictional bar contained in § 113(h) of CERCLA. In 1986, Congress amended CERCLA to add § 113(h) which bars federal courts from exercising jurisdiction over "any challenges" to removal or remedial environmental response actions taken pursuant to section 104 of CERCLA, 42 U.S.C. § 9604, while those response actions are ongoing. *McClellan Ecological Seepage Situation ("MESS") v. Perry*, 47 F.3d 325, 330 (9th Cir.1995). The provision reads:

No Federal court shall have jurisdiction under Federal law ... to review any challenges to removal or remedial action selected under [CERCLA § 104], of this title, or to review any order issued under [CERCLA § 106].

42 U.S.C. § 9613(h).

Congress passed this section in order to protect "the execution of a CERCLA plan

---

9. A general background of TCP, as well as its alleged existence at or near OHF, is set forth in the declaration of Lisa Decker, counsel for the City of Fresno. (Decker Dec., Doc. 152, ¶'s 3–13.)

during its pendency from lawsuits that might interfere with the expeditious clean-up effort." *McClellan,* 47 F.3d at 329. Section 113(h) amounts to a "blunt withdrawal" of jurisdiction from any challenges to a CERCLA cleanup. *Id.* The Ninth Circuit has held that a lawsuit qualifies as a "challenge" under § 113(h), and is thus barred, if it is "directly related to the goals of the cleanup itself." *Id.*

The parties dispute whether the OHF clean up proceeds under the authority of § 104.[10] The United States argues that the cleanup proceeds "pursuant to the CERCLA § 104 authority granted to it by the President in Executive Order 12,580 and under the DERP statute." According to the United States, this is an easy case: the OHF cleanup is a § 104 cleanup at a formerly owned defense site, nothing else. Plaintiff argues that the cleanup is being undertaken pursuant to the authority of § 120 of CERCLA, 42 U.S.C. § 9620, and therefore is properly categorized as a § 120 clean up. Section 120 contains provisions applicable to cleanups on currently owned federal facilities and does not trigger § 113(h)'s jurisdictional bar.

Relying on *Fort Ord Toxics Project, Inc. v. California EPA,* 189 F.3d 828 (9th Cir.1999), the City contends that the remediation activities at OHF are proceeding pursuant to § 120, not § 104. The City, however, ignores *Fort Ord's* direction that § 120 covers only federal facilities, not privately owned ones, and the statutory language of § 120 itself.[11] *Fort Ord* held that it was "unclear whether the legislators who voted for 113(h) subjectively intended to allow immediate challenges

to remedial actions at federal facilities even while disallowing such challenges at private facilities." *Id. Fort Ord* implies that challenges to remedial actions at private facilities—supposedly cleanups pursuant to § 104—are barred by § 113(h). Here, there is no dispute that OHF is privately owned by the City of Fresno and that the activities in question are "remedial activities."

The remediation work at OHF is also carried out under the Defense Environmental Restoration Program, a federal statute which authorizes the Department of Defense to conduct remediation activities on both currently owned DOD properties and formerly owned properties where the DOD was the owner, lessor, or possessor at the time of actions leading to contamination by hazardous substances. As for formerly owned DOD properties, the DERP statute authorizes the Formerly Used Defense Sites ("FUDS") program at 10 U.S.C. § 2701(c)(1)(B). Both parties here acknowledge that the work at OHF is part of the FUDS program.

Plaintiff argues that the Defense Environmental Restoration Program statute makes activities carried out under the statute subject to § 120 of CERCLA. It cites the DERP statute at 10 U.S.C. § 2701(a)(2) that program activities "shall be carried out subject to, and in a manner consistent with, section 120 (relating to Federal facilities) of CERCLA." Plaintiff cites this section to support its argument that the FUDS program operates under CERCLA § 120. Such an interpretation ignores the plain language of the section, which specifically references § 120 as re-

---

**10.** Section 104 of CERCLA authorizes the President, in response to a release or threatened release of a hazardous substance, to "remove [the substance] or [...] provide for remedial action [...] or take any other response measure consistent with the national contingency plan [...] to protect the public

health or welfare or the environment." 42 U.S.C. § 9604(a)(1).

**11.** Section 120's own terms apply to properties "owned or operated" by the federal government. The title of the heading in the legislation for § 120 is "Federal facilities."

lating to federal facilities in parentheses. Because the statute applies to both currently and formerly owned federal facilities, the statute directing DERP activities at federal facilities should be implemented in a manner consistent with CERCLA § 120 activities, which also apply at federal facilities. According to Plaintiff's argument, the DERP statute mandates that all its authorized activities be carried out under § 120, even those under FUDS that do not take place on federally owned properties. This makes little sense given that § 120 applies only to federal properties.

The United States also references the language in the cooperative agreement to support its contention that cleanup is performed pursuant to § 104. The cooperative agreement was discussed in detail by United States' counsel at oral argument on December 3, 2007:

> What's on the screen now is a page from what's known as the cooperative agreement. This is the agreement between the plaintiff, the United States, and the State of California about how the cleanup was going to be done, basically. That's the simple version.
>
> And if we look under the heading of jurisdiction on page 5 of that agreement, we see that the—it says that the National Guard Bureau and the U.S. Army Corps of Engineers enter into this agreement pursuant to CERCLA/SARA, the NCP, that's the National Contingency Plan required by CERCLA and promulgated by the EPA, Executive Order 12580 and DERP.
>
> And Your Honor, this is the same line of authority that's stemming from Section 104(a). Nothing—no reference to Section 120. Of course, that wouldn't make sense to have a formerly used defense site cleaned up under Section 120.
>
> I'd like to direct your attention to another reference in this agreement, Your Honor, on page 10, what's been marked

as paragraph (A)(I) [...] [t]his definition of the term USACE means the U.S. Army Corps of Engineers and also notes that it relates to the formerly used defense site, FUDS component of DERP, the Defense Environmental Restoration Program.

> It's apparent that this cleanup was going to involve a FUDS/DERP cleanup, and that again relates to Section 104(a) and Executive Order 12580 and not Section 120 [...]
>
> One final reference to the cooperative agreement, page 31. Under the heading of "Removal Action," I'm not going to read this, but on paragraph B, basically it's the same legal authority [discussed preciously] and subsection (c) even contains a reference to Section 104.
>
> Now this confirms what we've already seen in the other provisions of the agreement, and if this was a Section 120 cleanup, they would have been written much differently, and certainly the Section 104 reference wouldn't even be there.

(Reporter's Transcript, December 3, 2007, 11:18–12:19, 13:23–14:6).

In rebuttal, the City emphasizes that the Court should give great weight to recent factual developments "relating to activities and operations conducted on currently owned federal facilities causing the contamination at issue that is triggering remediation activities." This argument incorporates the United States' current operations at AVCRAD and CANG, which are on/near the OHF. However, neither AVCRAD nor CANG is involved in any aspect of the OHF cleanup:

> Counsel: Now, when this agreement was signed, the National Guard had agreed to cleanup certain of its own currently owned federal property. Now that was pursuant to Section 120, that there were two federal areas that the guard was cleaning up.

Court: Not the Old Hammer Field.

Counsel: In the area of Old Hammer Field [ . . . ] [however] the current cleanup doesn't involve these properties at all. That's the—the currently owned federal property is not involved in the cleanup.

But it shows—if we take that paragraph 6.3 on page 11 [of the cooperative agreement], it shows that the parties knew how to reference Section 120 when 120 was appropriate. It says that the National Guard are federal facilities under jurisdiction of the Secretary of Defense within the meaning of CERCLA Section 120 and SARA Section 211.

In contrast, the formerly owned, not the currently federal facility property, but the former federal facility property is set out in Section 6.6 [of the cooperative agreement]. Old Hammer Field is a formerly used defense site, FUDS, and is subject to the Defense Environmental Restoration program.

Now, this case only involves Old Hammer Field. There is no cleanup that the state has ordered on federal property. The National Guard has done that on its own property. It's not part of the case. And it's clear that the property at issue here was and is being cleaned up pursuant to DERPS and FUDS, and the authority for that comes from Section 104(a) as delegated through Executive Order 12580.

(RT, December 3, 2007, 12:20–13:22.)

Here, the City's arguments that "[t]here is no proof that the investigation and remediation activities at OHF are proceeding under the direction of the Department of Defense pursuant to Section 104 of CERCLA," are contradicted by the record. All remediation efforts are taking place on City-owned property; the cleanup is proceeding under E.O. 12580 and the DERP statute, implicating § 104, not § 120. Moreover, while the United States adequately explains the "consistent with § 120" issue, the City does not explain why the cooperative agreement cites E.O. 12580 and the DERP statute. In particular, the City does not address this question: why would the cooperative agreement cite E.O. 12580 and the DERP statute if the cleanup was to proceed pursuant to § 120?

At oral argument on March 22, 2010, the City again stressed the importance of the United States' admissions concerning its operation of the AVCRAD and CANG facilities at or near the OHF. According to Plaintiff, these admissions clearly demonstrate the cleanup is proceeding pursuant to § 120, not § 104:

[The United States] admit[s] in their briefs, on this very issue, that those [properties] are subject to CERCLA section 120. If you look at the United States' initial motion [ . . . ] if you look at the cooperative agreement, section 5.1(k) [ . . . ] it all discusses section 120 authority applying to the currently operated federal facilities [ . . . ]

And the critical issue, again, is that the United States admits that they are a federally-that they are operating pursuant to section 120, that they are a currently owned federal facility. Same with AVCRAD. And there's no dispute about that in the papers.

(Reporter's Transcript, March 22, 2010, 18:22–19:7, 21:11–21:16.)

Plaintiff's arguments are unpersuasive. First, the undisputed record points to a § 104 cleanup, not § 120. Second, Plaintiff overstates the United States' admissions concerning its AVCRAD and CANG operations. In the documents cited by Plaintiff, the United States stated: "The Cooperative Agreement noted that there are only two areas that are currently under the jurisdiction, control, or custody of

the U.S. Department of Defense: [CANG and AVCRAD]. These are the only portions subject to CERCLA Section 120. None of the RAP-required cleanup activities will occur on these areas. All of the remedial work will take place on property that is not owned or operated by the federal government." (Doc. 45–2, pg. 14 at fn. 9.) Contrary to Plaintiff's assertions, the government's admissions do not support its position. If anything, the statements weaken it.[12]

The case law is also contrary to the City's position. *Pollack v. U.S. Dep't of Defense*, 507 F.3d 522 (7th Cir.2007) is most applicable. There, the Seventh Circuit held that § 113(h) barred a lawsuit arising out of ongoing efforts to remediate an Illinois landfill located on property that used to be a U.S. Army base. *Pollack* reconciled Presidential authority under CERCLA, § 120, the National Priorities List, and the *Fort Ord* decision:

> Critically, § 120 does not provide a separate grant of authority for the President to initiate cleanups of federal sites or force private parties to do so. Hence a cleanup of a federally owned contaminated site must be initiated under §§ 104 or 106, just like the cleanup of a privately owned site.
>
> There is a wrinkle. Section 120 may create authority to clean up a certain type of federally owned property that does not include the landfill that is the subject of this lawsuit. As noted above, the nastiest sites in the country are listed on the National Priorities List and are to be cleaned up first thing. Section 120(e) requires the administrators of federal agencies that own property on this list to perform a remediation study and then to undertake any necessary remediation. Cleanup efforts of federal

NPL Superfund sites therefore arguably are initiated under § 120, rather than §§ 104 or 106. But there is no dispute that the landfill on the former Fort Sheridan is not on the National Priorities List, so § 120 does not provide any authority for initiating a cleanup of it. Such authority comes solely from §§ 104 and 106, and so this challenge to the Fort Sheridan cleanup remains subject to the bar set out in § 113(h).

> This explains the Ninth Circuit's decision in *Fort Ord Toxics Project, Inc. v. California EPA*, on which *Pollack* relies. [*Fort Ord*] held that a cleanup of a federally owned site was indeed initiated under § 120. Since § 113(h) only blocks challenges to cleanups initiated under §§ 104 or 106, the court ruled that the plaintiff's challenge was not subject to § 113(h) and could proceed. But the court noted that the property was listed on the NPL, and cited to § 120(e)'s grant of authority for cleaning such parcels. No other circuit has cited *Fort Ord*, but a district court confronting the same argument in the context of a non-NPL federal property—like Fort Sheridan in this case—concluded, correctly, we believe, that the cleanup was authorized by §§ 104 or 106 rather than § 120, and was therefore subject to § 113(h). The Ninth Circuit conceded that its *Fort Ord* decision was 'intuitively unappealing' and 'troubling.' We need not agree or disagree with that court's conclusion that cleanups to federally owned sites on the NPL are initiated under § 120 and hence not subject to the bar of § 113(h) because this case does not concern an NPL property.

*Id.* at 526 (citations omitted).

*Shea Homes Ltd. P'ship v. United States*, 397 F.Supp.2d 1194 (N.D.Cal.2005)

---

12. The language used to incorporate § 120—for the AVCRAD and CANG cleanup—differs from the language used in the OHF–RAP and Cooperative Agreement to remediate the OHF.

is also instructive. In dismissing Plaintiff's RCRA claim for lack of subject matter jurisdiction, *Shea Homes* focused on whether the cleanup site was listed on the National Priorities List and whether there was EPA involvement:

> Importantly, it was undisputed in *Fort Ord* that the clean up at issue was a remedial action being conducted by the EPA pursuant to the grant of authority created by § 120. The site at Fort Ord was placed by the EPA on the National Priorities List and the clean up was conducted pursuant to EPA's delegated authority through an interagency agreement between the EPA, the Army, and California state Agencies [ . . . ]
>
> In this case, however, the site at issue is not included on the National Priorities List and the EPA is not involved. As a result, authority to undertake the clean up has been delegated to the Secretary of Defense [pursuant to E.O. 12580 which delegates authority under § 104 to the Department of Defense] [ . . . ]
>
> As such [ . . . ] the response actions in this case were authorized by § 104 and thus are governed by § 113(h).

*Id.* at 1203 (citations omitted).

Applying *Pollack,* § 120 "merely supplements the existing CERCLA regime by bringing federal property owners up to the same standards as private owners; it does not create a separate system for the feds." *Id.* at 525. Under *Pollack,* § 120 does not provide a separate grant of authority beyond the facts of *Fort Ord.*[13] Assuming, *arguendo,* that AVCRAD and/or CANG changes the OHF to a "currently operated

federal facility," the OHF would still be characterized as a "non-NPL federal property," not being remediated by the EPA, similar to *Pollack* and *Shea Homes* (two § 104 cases). This line of authority does not support the City's position. Here, the OHF is properly classified as a "non-NPL non-federal property," which on the spectrum of 113(h) cases is one degree from *Pollack* and *Shea Homes* (non-NPL federal property) and two degrees from *Fort Ord* (NPL federal property).[14]

The City relies on *City of Moses Lake v. United States,* 416 F.Supp.2d 1015 (E.D.Wash.2005), for the proposition that the "physical 'location' of the remediation activities is immaterial to the analysis of whether contamination from a federal facility is driving the remediation." This is the City's best argument. *Moses Lake* held that the proposed plan was not a § 104 "removal" action, but a § 120 "remedial action," therefore Plaintiff was not jurisdictionally barred from seeking a preliminary injunction. *Id.* However, *Moses Lake* is distinguishable on a number of grounds, namely that it was decided on a motion for preliminary injunction, involved a "plan for proposed remediation" not ongoing remediation, a prior agreement specifically referenced § 120's authority, the cleanup site was listed on the NPL, and there was EPA involvement:

> In October 1992, the EPA placed the former LAFB on the National Priorities List. And in 1999, the Department of the Army entered into an interagency agreement with the EPA concerning the preparation and performance of the RI/FS (Remedial Investigation/Feasibility Study) for the Moses Lake Wellfield

---

13. Whether § 120 provides a separate grant of authority for the President to initiate cleanups of federal sites beyond the facts of *Fort Ord* need not be resolved here. It is enough to note the Seventh Circuit's analysis in *Pollack,* distinguish the facts of *Fort Ord,* and discuss the case law applying § 104 and § 120.

14. Like *Shea Homes,* the OHF is not listed on the NPL and the EPA is not involved with the current cleanup.

Contamination Site. The IAG specifically states that the EPA and the Army enter into "this Agreement pursuant to their respective authorities contained in Sections 101, 104, 107, 120 and 122" of CERCLA [...]

The EPA and the USACE are hereby PRELIMINARILY ENJOINED from formally issuing the proposed plan pending further order of this court. Within ten (10) days of the date of this order, EPA and the USACE shall make the proposed plan available to counsel for Moses Lake and all "relevant" Moses Lake officials involved in decision-making with regard to the Moses Lake Wellfield Contamination Site [...]

*Id.* at 1021, 1027.

The City fails to reconcile the relevant case law, including *Pollack, Shea Homes, Moses Lake,* and *OSI, Inc. v. United States,* 525 F.3d 1294 (11th Cir.2008).[15] They involved materially different issues from the one in this case. *Pollack, Shea*

*Homes and OSI, Inc.* dealt with whether 113(h)'s jurisdictional bar applied to federal facilities that were not listed on the NPL and/or did not involve the EPA. Conversely, *Fort Ord* and *Moses Lake* dealt with a federal facility that *was* listed on the NPL and involved the EPA. The OHF is a non-NPL non-federal property with no EPA involvement.[16]

The same reasoning applies to the City's most recent argument concerning TCP contamination. The City argues that because the "current State-approved remedial action plan for OHF does not yet address TCP, [thus] there can be no challenge to it that would implicate Section 113(h)." Applying the City's reasoning, anytime a new contaminant is *alleged* to be released on or near a current cleanup site—even if that site is privately owned and cleanup is proceeding under E.O. 12580 and/or DERP— § 113's jurisdictional bar is inapplicable.[17] This not only would lead to an illogical result, but also

---

**15.** *OSI, Inc. v. United States,* 525 F.3d 1294 (11th Cir.2008) is also instructive:

While [§ 120's] discussion of federal facilities is extensive, we have searched the language of the section in vain for a general authorization for the federal government to engage in remedial actions on federal facilities. The only language approaching such a grant of authority is in [§ 120(e)], which, as stated above, says a department "shall" engage in remedial investigation and action, but only after the site has been included on the NPL. Section [§ 120] contains no language authorizing any remedial activity if the site is not listed on the NPL. It is undisputed that the OU–1 site has not been placed on the NPL. The only language authorizing remedial actions on such sites is found in [§ 104], the language of which is broad enough to be read as an authorization for all remedial actions, regardless of the land upon which the action takes place. Therefore, we hold the Air Force's remedial action for OU–1, a federal facility not listed on the NPL, was "selected under" [§ 104] and is subject to the jurisdictional bar of [§ 113(h)] [...]

Our view of [§ 113(h)] for federal facilities not listed on the NPL comports with the view of the Seventh Circuit. The only other Circuit to address the jurisdictional bar for federal facilities and the source of authority for remedial actions is the Ninth Circuit in *Fort Ord* [...] which held challenges to federal site cleanups were not subject to [§ 113(h)'s] jurisdictional bar. As the court in *Pollack* noted, however, *Fort Ord* is distinguishable because there the federal facility was listed on the NPL. Where a federal facility is not listed on the NPL, the only language authorizing remedial or removal actions is found in § 104.

*Id.* at 1298–99.

**16.** *Fort Ord* is factually distinguishable as the lawsuit concerned contamination on federally owned property—an Army base—and "[i]n February 1990, *Fort Ord* was placed on the Environmental Protection Agency's National Priorities List."

**17.** The City offers no legal support for its theory. In addition, on these facts, introduction and remediation of a new contaminant at

conflicts with the stated purpose of § 113(h).

The City's arguments raise questions concerning how the ongoing remediation of a formerly owned federal property is impacted by the alleged discovery of a new contaminant. The City, however, does not bring its TCP allegations and AVCRAD/CANG arguments within the authority of § 120. The argument is weakened by the City's request to "solely enforce the existing orders from DTSC and RWQCB," that do not discuss TCP or concern AVCRAD/CANG. The relevant case law, including *Fort Ord, Pollack, Shea Homes, Moses Lake,* and *OSI, Inc.,* distinguishes the City's argument.

Here, all the evidence points to the applicability of § 104: the language of the cooperative agreement; OHF is privately owned by the City of Fresno; OHF is not listed on the NPL; the EPA is not involved in the cleanup of OHF; and neither AVCRAD nor CANG is involved in any aspect of the OHF cleanup. Nor does the City explain the specific inclusion of E.O. 12580 and DERP in the cooperative agreement (as opposed to the language re: the authority of § 120 to cleanup AVCRAD and CANG). The City's evidence is insufficient to create a genuine dispute of material fact that CERCLA § 120 applies to the OHF cleanup and not § 104.

### a. *Is There a Challenge under § 113(h)?*

The City contends that even if the cleanup efforts at the OHF site are proceeding under § 104, the complaint is not a "challenge" to a cleanup plan that removes jurisdiction. The United States responds that the City's RCRA cause of action constitutes such a challenge while the City contends that it does not. The City claims

the OHF site would necessarily involve the DTSC and RWQCB, as well as a "substantial and imminent" danger finding under the

that it is not attempting to challenge the cleanup because of "the presence of TCP in the groundwater." The proposed order and SAC, however, show that the City requests compliance with RCRA as well as to enforce the terms of the cooperative agreements and DTSC orders.

The City's arguments have been rejected by the Ninth Circuit in *McClellan Ecological Seepage Situation ("MESS") v. Perry,* 47 F.3d 325 and *Razore v. Tulalip Tribes,* 66 F.3d 236 (9th Cir.1995). In *MESS v. Perry,* the Ninth Circuit took a broad view of the scope of § 113(h). There, the plaintiffs made an argument similar to that advanced here: that their RCRA claim was not a "challenge" under § 113(h) because it was not attempting to delay or modify the remedy, but rather only sought to compel the defendant's compliance with RCRA's requirements. *Id.* at 330–31. The Court held that while tangentially related claims, such as those to enforce minimum wage requirements, do not constitute a challenge under § 113(h), the plaintiffs' claim was "far more directly related to the goals of the cleanup itself." *Id.* at 330. The Court also concluded that for "all practical purposes" the plaintiffs were effectively seeking to "improve" the clean up. *Id.* As such, it found that the plaintiff's claim was a "challenge" barred by § 113(h). *Id.*

*Shea Homes Ltd. P'ship v. United States,* 397 F.Supp.2d 1194, is also instructive. Citing *McClellan, Shea Homes* held that the plaintiff's RCRA claim was related to the cleanup's goals and would interfere with the ongoing cleanup efforts:

> Here, [Plaintiff] also argues that it is merely seeking to enforce Defendant's compliance with applicable state laws and requirements. It is apparent, however, that it has a different view of what

RCRA framework. The City does not develop these arguments as they relate to § 113(h)'s jurisdictional bar.

state law requires than does Defendant; otherwise it would have no purpose in seeking injunctive relief. Indeed, Plaintiff alleges that the Corps' response has not adequately contained or controlled the migration of landfill gas and that it should be 'enjoined to abate the migration.' Plaintiff also contends, as noted above, that the Corps has made improper choices with respect to the timing of certain elements of the remedy. As such, the Court concludes that Plaintiff effectively seeks injunctive relief to "improve" the on-going clean up. As such, Plaintiff's RCRA claim is plainly related to the goals of the clean up-and would likely require some interference with on-going clean up plans. Accordingly, the RCRA claim constitutes a "challenge" for purposes of § 113(h), and must therefore be dismissed for lack of jurisdiction.

*Id.* at 1204 (citations omitted).

The City argues that it is "solely seeking to enforce the existing orders from DTSC and RWQCB, not to second-guess or change them." The City further argues that a genuine dispute of fact exists because "the current State-approved remedial action plan for OHF does not yet address TCP." It is unclear, however, how TCP is related to the proposed injunction relief—the proposed order does not address TCP contamination. Here, the City's request to enforce the existing DTSC and RWQCB orders—and their provisions to divide the remediation into discrete tasks—constitutes a "challenge" under *McClellan* and *Shea Homes,* as well as other Ninth Circuit authority. *See, e.g., Hanford Downwinders Coalition, Inc. v. Dowdle,* 71 F.3d 1469, 1482 (9th Cir.1995) ("We held in *Razore v. Tulalip Tribes,* that '[a]n action constitutes a challenge if it is related to the goals of the cleanup.' ").

The City's fourth claim under RCRA is DISMISSED WITH PREJUDICE for lack of subject matter jurisdiction pursuant to § 113(h) of CERCLA.

### 2. *Imminent and Substantial Finding, Mootness, Primary JX*

█ Because Defendant's summary judgment motion is barred by § 113(h) of CERCLA, it is unnecessary to resolve the issues concerning mootness, the primary jurisdiction doctrine, and whether the City has satisfied RCRA's "imminent and substantial endangerment" requirement.[18]

Assuming, *arguendo,* that § 113(h) does not bar the City's RCRA claim, it is unclear how the City demonstrates "credible evidence" to suggest than the current levels of TCP contamination create an imminent or substantial endangerment to health or the environment exists at or near the OHF.[19] Moreover, the State of Califor-

---

18. Under the doctrine of primary jurisdiction, when certain issues or forms of requested relief require the resolution of matters that fall "beyond the conventional experience of judges" or are "within the realm of [...] an administrative agency with more specialized experience, expertise, and insight [than the judiciary]," a court may either stay the action until the agency has considered the issue, or may dismiss the claims altogether. *United States v. Gabelli,* 345 F.Supp.2d 340, 350–51 (S.D.N.Y.2004). This judicially created doctrine serves two primary interests. First, it allows the resolution of "technical questions of fact through an agency's specialized expertise prior to judicial consideration of the legal claims." Second, such deference ensures "consistency and uniformity in the regulation of an area" entrusted to an agency by the legislature through a regulatory scheme. *Id.*

19. RCRA provides for citizen suits "against any person ... who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Under this section, "[a]n endangerment can only be 'imminent' if it 'threatens to occur immediately.' " *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 485,

nia, through the DTSC and RWQCB, has oversight over the remediation and has the scientific understanding and resources necessary to investigate and remediate alleged hazards. Conversely, the district court has neither the resources nor expertise necessary to properly address the scientific issues presented by an alleged imminent and substantial endangerment to health or the environment.

These concerns are shared by a number of district courts throughout the United States. *See West Coast Home Builders, Inc. v. Aventis Cropscience USA Inc.,* No. 04–2225–SI, 2009 WL 2612380 (N.D.Cal. 2009) ("There are two fundamental problems with plaintiff's RCRA claim [...] [f]irst, the Consent Order already requires GBF/TRC to clean up the groundwater contamination, and that remediation has been underway for years [ ] Plaintiff seeks relief that it is already obtaining outside of this lawsuit."); *see also River Vill. W. LLC v. Peoples Gas Light and Coke Co.,* 618 F.Supp.2d 847, 854–55 (N.D.Ill.2008) ("Unlike the district court, the [agency] has been specifically charged with the responsibility to develop and enforce regulations to implement the environmental laws passed by Congress [...] the district court's handling of this matter would be delayed by years if research and discovery which would be necessary to develop a basic understanding of the [contamination area and hazards presented]."); *OSI, Inc. v. United States,* 510 F.Supp.2d 531 (M.D.Ala.2007) ("OSI has presented no [ ]

evidence to suggest that an imminent or substantial endangerment to health or the environment exists on OSI or Government property. Furthermore, the Government is conducting a remediation program in conjunction with ADEM to repair any contamination and resulting dangers that do exist [...] [t]hese two factors together lead the Court to conclude that the Government is entitled to summary judgment."); *Davis Bros., Inc. v. Thornton Oil Co.,* 12 F.Supp.2d 1333, 1338 (M.D.Ga. 1998) ("[P]laintiff has presented no credible evidence supporting a finding of imminent and substantial endangerment to health or the environment [...][m]oreover, the proposed remedy of injunctive relief is moot because Conoco has already agreed to remediate the site and pay for any costs associated with the cleanup, and the state is overseeing the cleanup more effectively than the court ever could. Thus, the RCRA claim fails on the merits, and is also moot."). This language applies with equal force to this case.

## C. *HSAA CLAIM*

The United States argues that the Court lacks subject matter jurisdiction to hear the HSAA claim because the United States has not waived sovereign immunity. The City disagrees.

In enacting CERCLA, Congress "envisioned a partnership between various levels of government in addressing the complex and costly problems associated with hazardous waste remediation." *Fire-*

---

116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) (quoting Webster's New International Dictionary of English Language 1245 (2d ed. 1934)). "[T]his language 'implies that there must be a threat which is present now, although the impact of the threat may not be felt until later.'" *Id.* (quoting *Price v. United States Navy,* 39 F.3d 1011, 1019 (9th Cir.1994)). To show an "imminent and substantial" threat, the plaintiff must do more than establish the presence of solid or hazardous wastes at a

site. *Foster v. United States,* 922 F.Supp. 642, 661 (D.D.C.1996). Instead, "endangerment must [be shown to] be substantial or serious, and there must be some necessity for the action." *Price,* 39 F.3d at 1019. The fact that remedial activity in accordance with CERCLA has commenced at a site greatly reduces the likelihood that a threat to health or the environment is imminent. *Christie–Spencer Corp. v. Hausman Realty Co., Inc.,* 118 F.Supp.2d 408, 419–23 (S.D.N.Y.2000).

*man's Fund Ins. Co. v. City of Lodi, Cal.,* 302 F.3d 928, 940 (9th Cir.2002). CERCLA specifically anticipates states enacting legislation addressing environmental remediation. *Id.* at 942. In California, the Carpenter–Presley–Tanner Hazardous Substance Account Act ("HSAA"), Cal. Health & Safety Code § 25300 *et seq.,* grants the DTSC authority to require the cleanup of sites within the state where chemical contamination represents a threat to human health or the environment. *Id.* at 934. HSAA is the state law counterpart to CERCLA. *Foster–Gardner, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA,* 18 Cal.4th 857, 865, 77 Cal.Rptr.2d 107, 959 P.2d 265 (1998); *City of Lodi v. Randtron,* 118 Cal.App.4th 337, 351, 13 Cal.Rptr.3d 107 (2004). Under HSAA, DTSC oversees the cleanup of hazardous waste sites by issuing remedial orders and by entering into agreements with potentially responsible parties ("PRPs") to facilitate remediation efforts. *Fireman's Fund,* 302 F.3d at 934. Both the federal and state statutes are designed to: (1) achieve the complete and cost-effective cleanup of contaminated sites; and (2) provide a way to assign those costs to the parties responsible for the contamination. *Id.* at 945–46.

Under CERCLA, departments and agencies of the United States are subject to liability to the same extent as any nongovernmental entity. *United States v. Shell Oil Co.,* 294 F.3d 1045, 1052–53 (9th Cir.2002). Section 120(a)(1) explicitly waives the sovereign immunity of the United States with respect to CERCLA actions. *Id.* Regarding state laws governing hazardous waste response, § 120(a)(4) of the CERCLA statute addresses their application to the federal government:

> State laws concerning removal and remedial action, including State laws regarding enforcement, shall apply to removal and remedial action *at facilities owned or operated by a department,* *agency, or instrumentality of the United States* ... when such facilities are not included on the National Priorities List. The preceding sentence shall not apply to the extent a State law would apply any standard or requirement to such facilities which is more stringent than the standards and requirements applicable to facilities which are not owned or operated by any such department, agency, or instrumentality.

42 U.S.C. § 9620(a)(4) (emphasis added).

■ The law regarding waivers of the sovereign immunity of the United States is straightforward. Absent an express waiver, "the activities of the federal government are free from regulation by any state." *United States v. State of Wash.,* 872 F.2d 874, 877 (9th Cir.1989) (quoting *Mayo v. United States,* 319 U.S. 441, 445, 63 S.Ct. 1137, 87 L.Ed. 1504 (1943)). Any waiver of United States sovereign immunity must be unequivocal; it cannot be implied. *United States Dep't of Energy v. Ohio,* 503 U.S. 607, 615, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992); *State of Wash.,* 872 F.2d at 877. Such a waiver "must be construed strictly in favor of the sovereign and not enlarged beyond what the language requires." *Ohio,* 503 U.S. at 615, 112 S.Ct. 1627 (citations and quotations omitted). Furthermore, only Congress can waive the sovereign immunity of the United States. *Cal. v. NRG Energy Inc.,* 391 F.3d 1011, 1023–24 (9th Cir.2004); *Tucson Airport Auth. v. Gen. Dynamics Corp.,* 136 F.3d 641, 644 (9th Cir.1998). It must do so explicitly in statutory text. *United States v. Nordic Village, Inc.,* 503 U.S. 30, 37, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) ("[t]he 'unequivocal expression' of elimination of sovereign immunity that we insist upon is an expression in statutory text.").

To determine whether the United States waived its sovereign immunity under

§ 120(a)(4), it is necessary to harmonize the arguments advanced by the parties in the original briefing with those raised in the renewed motion. In 2007, the City argued CERCLA § 120(a)(4) includes both facilities currently owned or operated by the United States, as well as those that were formerly owned or operated, such as OHF. According to the City, because OHF was a "formerly operated facility," § 120(a)(4)'s waiver of sovereign immunity applies to OHF and the City's HSAA claim against the United States survives. The City relied exclusively on *Tenaya Assoc. Ltd. P'ship v. United States Forest Serv.,* No. CV–F–92–5375 REC, 1995 WL 433290 (E.D.Cal. May 19, 1993) as the "law of this district."

In *Tenaya,* the court found that the § 120(a)(4) waiver included a waste site in Fish Camp, California that the United States had formerly operated and owned. *Tenaya* stated § 120(a)(4) is "meant to include all actions brought against the United States for harms which occur during a time when the United States owns or operates a facility." *Id.* at *2. The court observed that this interpretation preserved the present tense wording of the section and provided a clear limit on the waiver of sovereign immunity in that immunity was maintained for past harms that occurred before the government owned or operated the facility. *Id.* Citing surrounding CERCLA provisions in support of its conclusion, the *Tenaya* court explained that § 120(a)(4) should be read in conjunction with sections 120(a)(1) and section 107(a)(2), which subject federal facilities to the full extent of CERCLA liability and define who is liable, respectively. *Id.* at *2–3. This reading avoided what the *Tenaya* court termed an illogical outcome, namely, that if formerly owned or operated facilities were not included then (1) the United States would be liable for all past harms as long as it currently owned or operated a facility, regardless of whether it

created those harms, and (2) the government could avoid liability by simply selling land that it contaminated before a lawsuit was initiated. *Id.* at *3.

■ *Tenaya* is not binding authority on another District court. Nor is it accurate to say it is "the law of this district." District court opinions are relevant for their persuasive authority but they do not bind other district courts within the same district. *See, e.g., Hart v. Massanari,* 266 F.3d 1155, 1174 (9th Cir.2001). Second, the *Tenaya* opinion is not persuasive. Every district court decision on this issue since has held that § 120(a)(4) only waives sovereign immunity for state law claims related to facilities currently owned or operated by the United States. *See Steadfast Ins. Co. v. United States,* No. CV 06–4686–AHM–RZX (C.D.Cal. Feb. 6, 2009); *Gen. Motors Corp. v. Hirschfield Steel Serv. Ctr., Inc.,* 402 F.Supp.2d 800, 804 (E.D.Mich.2005); *Miami–Dade County v. United States,* 345 F.Supp.2d 1319, 1354 (S.D.Fla.2004); *Crowley Marine Servs., Inc. v. Fednav Ltd.,* 915 F.Supp. 218, 222 (E.D.Wash.1995); *Rospatch Jessco Corp. v. Chrysler Corp.,* 829 F.Supp. 224, 227 (W.D.Mich.1993). In so holding these courts have emphasized that a waiver must be unequivocal and cannot be implied. The facts and ruling in *Tenaya* are not helpful or persuasive in this case.

■ The arguments raised in the renewed motion are addressed in light of the majority view interpreting § 120(a)(4), i.e., *Tenaya's* inapplicability. Here, the substance of the United States' renewed motion mirrors that of its original motion: that none of the remediation is taking place on a federally owned facility, therefore § 120(a)'s waiver provisions do not apply. The City, in contrast, now argues that the United States waived its sovereign immunity by operating AVCRAD and CANG facilities at OHF—making it a

"current operator"—, a position developed during an exchange between the Court and the City's counsel on December 3, 2007:

Court: So by the presence of the Air Guard, you say that this is a current federal facility that's in operation.

Counsel: That is correct. There are parts of it that are currently in operation, and the National Guard Bureau is named in our complaint, it comes to all of the Old Hammer Field steering committee meetings. There are issues relating to their use of the site. The United States said that it pertains to a completely different issue. He said that the currently owned federal properties are not involved in the cleanup. That is absolutely not the case. There is PCE that has been released from the KANG parcels that is part of this. Some of the releases from the KANG parcels have commingled with the plume that emanates from Area 1, which create issues in terms of what needs to be done to clean up.

And therefore, because you have a commingled waste plume, you can't necessarily say, you know, you can't really distinguish whose fault it is, and what cleanup is necessary because of what actions.

And, again, those are issues that will obviously develop for the Court as we move forward, but at this point there are issues of divisability [sic] and issues of who is responsible for what that aren't ripe for decision . . .

Court: Are those facts in the complaint?

Counsel: The facts that the Guard is currently operating?

Court: Yes, and on-site?

Counsel: I believe that those are in the complaint, and if it's not, that would be a simple matter to amend.

(Reporter's Transcript ("RT"), December 3, 2007, 53:2–54:12.)

On June 9, 2009,[20] the City filed the operative second amended complaint, which included new/modified allegations that the United States is a "current operator" at OHF pursuant to its AVCRAD and CANG operations:

25. The United States is both a part and current operator of OHF, and has operated at OHF from 1941 to the present [ . . . ]

32. The California Army National Guard ("CANG") units, through the Transportation Aircraft Repair Shop ("TARS") and the Aviation Classification Repair Activity Depot ("AVCRAD"), whose interests are represented by the USACE, performed, among other activities, cleaning, stripping, repair, overhaul, maintenance, refurbishing and construction of helicopters and aircraft and associated parts at OHF on land and property leased from the City. As such, this Complaint hereafter refers to all activities conducted by CARNG, TARS, AVCRAD as though conducted by defendant USACE. USACE leased certain portions of the property and land on OHF at which it conducted its operations from the City between 1961 and at least 1987. USACE continued, since 1987 to the present, to lease certain portions of property and land at OHF at which it continued and continues to conduct its operations.

20. The City's motion for leave to file the second amendment complaint was filed on May 23, 2009. (Doc. 123.) Leave was granted on June 9, 2009. (Doc. 127.)

33. During the time it leased property from the City, USACE, among other activities, modified aircraft and remanufactured aircraft parts for the United States in connection with the Korean war as well as other ongoing and general defense support activities.

34. USACE leased various buildings and land from the City at OHF, conducting its primary operations in three locations at OHF, including in and around Hangar T–282 and Hangar P–3, the East Air Terminal Drive facility and the Airways Avenue locations, as well as surrounding buildings, and elsewhere on the leased land.

35. In the course of its activities and operations, upon information and belief USACE has used, stored and released numerous chemicals, hazardous substances, wastes, materials, pollutants, and contaminants, including but not limited to PCE, TCE, and TCP at, under, adjacent to and downgradient of OHF that have negatively impacted the land, soil and ground water at, under, adjacent to and downgradient of OHF.

36. In the course of its activities and operations at OHF, USACE has released and continues to release hazardous substances, wastes, materials, pollutants and contaminants into the ground water, soil and environment at OHF, including, but not limited to dumping and pouring waste TCE directly into the sewer system, which releases and continued threatened releases have caused the City to incur necessary response costs associated with OHF consistent with the NCP in excess of the City's fair share of any such costs, as well as other damages.

37. The California Air National Guard ("CANG"), whose interests are represented by the NGB, has conducted and now conducts its operations and activities on land and property leased from the City. As such, this Complaint hereafter refers to all activities conducted by CANG as though conducted by defendant NGB. NGB leased the property and land on OHF at which it conducted and conducts its operations from the City between at least 1954 and the present.

39. In the course of its operations and activities at OHF, upon information and belief NGB has used, stored and released numerous chemicals, hazardous substances, wastes, materials, pollutants and contaminants, including but not limited to PCE, TCE and TCP, at, under, adjacent to and downgradient of OHF that have negatively impacted the land, soil and ground water at, under, adjacent to and downgradient of OHF.

40. NGB is a current owner of a federal facility at OHF.

41. In the course of its activities and operations at OHF, NGB has and continues to release hazardous substances, wastes, materials, pollutants and contaminants into the ground water, soil and environment at OHF, which releases and continued threatened releases have caused the City to incur necessary response costs associated with OHF consistent with the NCP in excess of the City's fair share of any such costs, as well as other damages [...]

52. Upon information and belief, other hazardous substances, wastes, con-

taminants, pollutants, and materials, including TCP, have also been identified as present in the soil and ground water at, under, adjacent to and downgradient of OHF [ . . . ]

124. The City has incurred, and will continue to incur, response costs, including costs of investigation, removal and/or remedial actions, in the investigation, clean up and abatement of the releases and threatened releases of hazardous substances from all of the Defendants' operations and activities at OHF, including but not limited to the continuing cost of implementing the OHF RAP, all pursuant to HSAA and CERCLA and therefore is entitled to contribution and indemnity from defendants, together with interest, under HSAA, Health and Safety Code § 25363(e).

(SAC, ¶'s 25, 32–37, 39–41, 52, 124.)

The City's new allegations raise the question of what effect the United States' operation of AVCRAD and CANG have on the issue of waiver under § 120(a)(4). The United States argues that the operation has no effect because the actual remediation is taking place on land owned by the City, not federal property. The United States also maintains that the property leased by the federal government—AVCRAD and CANG—was remediated, therefore the City did not incur any response costs on federal property. The City responds that it satisfies *Iqbal* because it "alleged in its SAC that the response costs were incurred at property that is currently owned or operated by the United States."

■ The United States is correct. The City's primary argument fails on the specific facts of this case, as the OHF remediation is taking place on property owned by the City, not the federal government. (*See* SAC, Doc. 123–3, ¶ 5 ("The City, which is involved solely because it owns the property the Defendants contaminated [ . . . . ]"; Doc. 123–3 at ¶ 38 ("[The United States] continues to lease property from the City [ . . . . ]"); Doc. 123–3 at ¶ 55 ("The City was identified by the State as a PRP solely because of its ownership of the OHF property [ . . . . ]")). Moreover, the exhibits/maps attached to the SAC demonstrate that the remediation site is separate and distinct from AVCRAD and CANG, i.e., the alleged "current federal operations." [21] (*See* Docs. 123–4 through 123–6; Doc. 123–3, ¶ 34.) The mere presence of the AVCRAD and CANG facilities—on the OHF airfield generally—does not transmute the *entire cleanup* into a remedial action at a "federally owned or controlled" facility; such unaffiliated federal facilities are outside the scope of § 120(a)(4). [22] The City

---

[21] Generally, to avoid converting a motion for judgment on the pleadings into a motion for summary judgment, the Court may only consider the face of the complaint. *See* Fed. R.Civ.P. 12(c); *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002). However, the incorporation by reference doctrine allows the Court to consider any exhibits attached to the complaint as well as any documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir.2005). The Court may also "take judicial notice of matters of public record" and consider them without converting the motion into one for summary judgment. *United States v. 14.02 Acres*, 547 F.3d 943, 955 (9th Cir.2008).

[22] Specifically, the City alleges that "[t]he United States is both a past and current operator of OHF, and has operated at OHF from 1941 to the present." (Doc. 123–3, ¶ 25.) However, the City conflates two distinct definitions/operations: (1) federal operations/facilities, generally; and (2) removal or remedial actions at *"facilities owned or operated by a department, agency, or instrumentality of the United States."* 42 U.S.C. § 9620(a)(4) (em-

does not sufficiently allege that there is a remedial action at a "facility" owned or operated by the federal government.[23] *See Iqbal,* 129 S.Ct. at 1950 ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss [ ... ] where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief.").

At oral argument on March 22, 2010, the City argued that the United States waived its sovereign immunity by signing the 1994 cooperative agreement. The relevant portion of the Agreement provides:

Potentially Responsible Party Agreement Under CERCLA/SARA, the NCP, California Health and Safety Code §§ 25355.5, 25353 and 25347.6.

(Doc. 45–6, pg. 7.)

The City relies on *Kaffenberger v. United States,* 314 F.3d 944 (8th Cir.2003) for the proposition that the United States waived its sovereign immunity because the cooperative agreement incorporated the HSAA.

The City's argument is a nonstarter. First, *Kaffenberger* is based on a tax law nuance: Congress, as the only branch able to waive the United States' sovereign immunity, provided a "mechanism that allows the IRS and taxpayer to extend the period for bringing suit to recover a refund beyond the normal two-year statutory period." *Id.* at 952. *Kaffenberger* is distinguishable; there is no such congressional action in this case. Second, the City's reasoning conflicts with the general rule that "only an express statute may waive the sovereign immunity of the United States." *Lion Raisins, Inc. v. United States,* 58 Fed.Cl. 391, 396 (Fed.Cl.2003) (citation omitted). These two factors together lead to the conclusion that the United States did not waive its sovereign immunity when it signed the cooperative agreement.

The City has failed to state facts sufficient to state a claim under the HSAA. A claim is plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. 1937, 1949 (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).). The SAC's third cause of action under the HSAA does not meet this standard. *See In re Syntex Corp. Sec. Litig.,* 95 F.3d 922, 926 (9th Cir.1996) ("Conclusory allegations and unwarranted inferences are insufficient to defeat a mo-

---

phasis added). Here, the City acknowledges that the United States does not own—or conduct operations—at the remediation site. Instead, it alleges that the United States' adjacent operations-on the larger OHF airfield-constitute applicable "facilities" under § 9620(a)(4).

23. *Robinson v. U.S. Cold Storage, Inc.,* No. 01–697–GMS, 2002 WL 187511 (D.Del. Feb. 5, 2002) is instructive:

The waiver language in CERCLA is not sufficient to permit an exercise of jurisdiction over the U.S. Air Force under the facts in this case. USCS's claim hinges on the fact that the U.S. Air Force crashed a plane on the cite in 1954. CERCLA, however, only waives immunity as to "facilities" owned by the United States. The United States did not own the site in question. Further, the court cannot conclude that the common meaning of facility encompasses an airplane that passed over the site and accidentally crashed there. Moreover, since the plane no longer exists, the court refuses to find that it is a facility [ ... ] Since the plane is neither a facility [ ... ] the court finds that USCS has failed to allege facts that prove the U.S. Air Force has engaged in an activity that would cause the court to conclude that it has waived its sovereign immunity under CERCLA.

*Id.* at *3.

tion for judgment on the pleadings."). The United States' motion is GRANTED.

The City's HSAA claim is based on the conclusory allegation that the AVCRAD and CANG operations are "currently owned or operated federal facilities," as defined by 42 U.S.C. § 9620(a)(4). However, there are no facts alleged in the SAC which support such a conclusion. First, the remediation "facility" or "site" is owned by the City of Fresno, not the federal government. It is clear from the SAC—and attached exhibits—that the remediation site is only a portion of the larger OHF and is not located on the property leased by the federal government (for its AVCRAD or CANG operations). Second, it is/was impossible for the City to incur response costs at either AVCRAD or CANG because the Corps remediated both sites many years ago.[24] For these reasons, the HSAA claim is DISMISSED WITH PREJUDICE.[25]

## V. CONCLUSION

For the reasons stated:

(1) The United States' motion for partial summary judgment on the City's RCRA claim is GRANTED; and

(2) The United States' motion for partial judgment on the pleadings on the City's HSAA claim is GRANTED.

The United States shall submit a form of order consistent with, and within five (5) days following electronic service of, this memorandum decision.

IT IS SO ORDERED.

## MEMORANDUM DECISION RE: THE CITY OF FRESNO'S MOTION FOR RECONSIDERATION OF THE COURT'S APRIL 22, 2010 DISMISSAL OF THE CITY'S RCRA AND HSAA CLAIMS (Doc. 281)

### I. INTRODUCTION.

Plaintiff City of Fresno brings this motion for reconsideration, pursuant to Federal Rule 59(e), of the April 22, 2010 Memorandum Decision, granting two motions filed by the United States: (1) for partial judgment on the pleadings or partial summary judgment as to Plaintiff's fourth claim under the RCRA; and (2) for partial judgment on the pleadings as to Plaintiff's third claim under the HSAA. According to the City, the Court overlooked controlling authority and facts advanced in its opposition which establish a genuine issue of fact on whether CERCLA § 120 applies to the OHF cleanup, not § 104. The City also moves for reconsideration on grounds that it uncovered "newly discovered evidence" concerning TCP.

### II. FACTUAL BACKGROUND.

#### A. General Factual Background

This case involves a cost recovery/contribution action under CERCLA and related

---

**24.** The City alleges that it incurred response costs stemming from the "implement[ation] [of] the OHF RAP" and "in excess of the City's fair share of any such costs." As explained *supra*, however, the OHF cleanup involves City-owned property, not federally owned or controlled facilities. The government also notes that it is/was impossible for the City to incur response costs at either AVCRAD or CANG because the Corps remediated both sites many years ago.

**25.** For these reasons, any amendment to Plaintiff's HSAA claims would be futile. *See* *generally Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1298 (9th Cir.1998) ("Although there is a general rule that parties are allowed to amend their pleadings, it does not extend to cases in which any amendment would be an exercise in futility, or where the amended complaint would also be subject to dismissal ...." (citations omitted)). Moreover, the City did not request leave to amend in either its original or renewed opposition. However, if the City now contends it can sustain a HSAA claim, it may file a motion under Rule 15(a) of the Federal Rules of Civil Procedure.

statutes, arising from the parties' continuing efforts to investigate and clean up Old Hammer Field ("OHF") in Northeast Fresno, a site presently occupied by the Fresno–Yosemite International Airport ("FAT").[1] Pursuant to an interim cost sharing agreement dating back to 1993, the parties have funded the cleanup and remediation of contamination at the OHF. One of those parties, the City, now claims that it has paid too much.

On November 2, 2006 the City commenced this civil action against Defendants the Boeing Company ("Boeing"), the United States of America, United States Army Corps of Engineers, and the National Guard Bureau (collectively, the "United States"). (Doc. 1.) In March 2008, the action was stayed for a settlement reportedly reached among the parties. (Doc. 63.) In March 2009, however, the City raised new allegations in relating to a previously undisclosed contaminant at OHF, 1,2,3–trichloropropane ("TCP"). In April of 2009 the stay was lifted. (Doc. 122.) The City filed the second amended complaint on June 9, 2009 setting forth new allegations regarding the presence of TCP at OHF. (Doc. 123–3.)

## B. *The April 22, 2010 Memorandum Decision*

On April 23, 2007, Defendant United States moved for partial judgment on the pleadings or partial summary judgment on Plaintiff's RCRA claim and for partial

judgment on the pleadings as to the HSAA claim. The case was subsequently stayed pending settlement negotiations. On April 17, 2009, the stay was lifted and Plaintiff was ordered to file an amended complaint.

Plaintiff filed a second amended complaint on May 18, 2009, advancing twelve causes of action, including claims under CERCLA, RCRA and the HSAA.[2] Defendant United States filed a "Notice of Renewal of Pending Dispositive Motions" on August 7, 2009. The unopposed motion was granted on August 12, 2009.

On August 20, 2009, the United States renoticed its motion for summary adjudication on Plaintiff's RCRA and HSAA claims.[3] The City opposed the motion on September 14, 2009. By Memorandum Decision dated April 22, 2009, the Court determined that: (1) the OHF cleanup is proceeding pursuant to § 104, not § 120, therefore § 113(h) of CERCLA bars the City's RCRA claim; and (2) the City failed to state facts sufficient to state a claim under the HSAA.

The City now moves for reconsideration of that decision, arguing that the facts as pled demonstrate that its RCRA and HSAA claims must go forward. The United States opposes the City's motion on its merits, but asserts that if reconsideration is granted, the City's claims are infirm for the alternative grounds originally argued in its motion.

1. The State of California, through its Department of Toxic Substances Control ("DTSC") and the Regional Water Quality Control Board ("RWQCB") ("State Agencies") has oversight over the cleanup. *City of Fresno v. United States*, 709 F.Supp.2d 888, 892–93(E.D.Cal.2010). The parties work together as the Old Hammer Field Steering Committee and have entered into multiple agreements since 1993, including a 1993 Cost–Sharing Agreement containing an interim allocation of costs and specification of remedial tasks to be performed. *Id.* The Steering Committee re-

tained consultant ERM West, Inc. to perform the remedial work at OHF. *Id.*

2. The City also advanced a number of state law theories, including trespass, nuisance, negligence, waste, and equitable indemnity. (Doc. 123–2 at ¶¶ 136–86.)

3. The United States' original motion was filed on April 23, 2007. Oral argument was held on each round of briefing, the first on December 3, 2007, the second on March 22, 2010.

### III. PROCEDURAL BACKGROUND.

On May 26, 2010, the City moved for reconsideration of the April 22, 2010 Memorandum Decision. The United States opposed the motion on June 3, 2010. Oral argument was held on June 14, 2010.

### IV. LEGAL STANDARD.

#### A. Rule 59(e)

Federal Rule of Civil Procedure 59(e) provides a mechanism for a court to alter, amend, or vacate a prior order. See Fed. R. Civ. Pro. 59(e); *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1415 (9th Cir.1994). "While Rule 59(e) permits a district court to reconsider and amend a previous order, the rule offers an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir.2003); *Kona Enters. v. Estate of Bishop*, 229 F.3d 877, 890–91 (9th Cir.2000). "A party seeking reconsideration must show more than a disagreement with the Court's decision, and recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden." *United States v. Westlands Water Dist.*, 134 F.Supp.2d 1111, 1131 (E.D.Cal.2001). In other words, where a party presents no arguments in the motion for reconsideration that had not already been raised in opposition to summary judgment, Rule 59(e) relief may be denied. *Taylor v. Knapp*, 871 F.2d 803, 805 (9th Cir.1989); *Backlund v. Barnhart*, 778 F.2d 1386, 1388 (9th Cir.1985). "Rule 59(e) amendments are appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Dixon v. Wallowa County*, 336 F.3d 1013, 1022 (9th Cir.2003). This standard is a "high hurdle." *Weeks v. Bayer*,

246 F.3d 1231, 1236 (9th Cir.2001). Rule 59(e) motions "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir.2009); *Carroll*, 342 F.3d at 945. Rule 59(e) "does not provide a vehicle for a party to undo its own procedural failures [or] allow a party to introduce new evidence or advance new arguments that could and should have been presented to the district court prior to the judgment." *DiMarco–Zappa v. Cabanillas*, 238 F.3d 25, 34 (1st Cir.2001).

### V. DISCUSSION.

#### A. RCRA

The City contends that relief under Rule 59(e) is appropriate for three reasons: (1) the Court erroneously concluded that a facility must be on the National Priorities List ("NPL") in order for there to be a § 120 cleanup; (2) the Court erred when it failed to recognize that downgradient contamination is included in the definition of "facility" under RCRA; and (3) there exists "newly discovered" evidence concerning TCP contamination at the OHF.

##### 1. National Priorities List

The City first argues that it meets the requirements set forth in Federal Rule 59(e). In particular, the City submits that the Court erroneously held that a facility must be on the NPL in order for the remediation to proceed under § 120. Accordingly, the City's arguments implicate the "clear error" language of Rule 59(e).

The NPL is the list of hazardous waste sites eligible for long-term remedial action financed under the federal Superfund program. *New Mexico v. General Elec. Co.*, 467 F.3d 1223, 1227 fn. 4 (10th Cir.2006). CERCLA requires the EPA to maintain the NPL, which is intended primarily to guide the EPA in determining

which sites warrant further investigation. *Village of DePue, Ill. v. Exxon Mobil Corp.,* 537 F.3d 775, 779 (7th Cir.2008). CERCLA and accompanying EPA regulations outline a formal process for assessing hazardous waste sites and placing them on the NPL. *See* 42 U.S.C. § 9605; 40 C.F.R. § 300.425. A site's cleanup may not be financed by Superfund monies unless the site is on the NPL. *Village of DePue,* 537 F.3d at 779. Placement on the list does not mean, however, that any remedial or removal action must be taken by the government. *Id.*

Relying on *Beck v. Prupis,* 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000), *Romero–Ruiz v. Mukasey,* 538 F.3d 1057, 1062 (9th Cir.2008), *United States v. Colorado,* 990 F.2d 1565 (10th Cir.1993), and 42 U.S.C. § 9620(a)(4), the City argues that it was clear error to hold that "a remediation is not a federal cleanup conducted pursuant to Section 120 unless it is on the NPL." However, absent from the City's string citation—and motion—is specific language of the April 22, 2010 Memorandum Decision holding that an NPL listing is an absolute prerequisite to a § 120 cleanup. This is best explained by the non-existence of such language, especially given the length and detail of the City's motion. A review of the April 22, 2010 Memorandum Decision makes clear that listing on the NPL was but *one* of five factors in the analysis:

> all the evidence points to the applicability of § 104: the language of the cooperative agreement; OHF is privately owned by the City of Fresno; OHF is not listed on the NPL; the EPA is not involved in the cleanup of OHF; and neither AVCRAD nor CANG is involved in any aspect of the OHF cleanup. Nor does the City explain the specific inclu-

sion of E.O. 12580 and DERP in the cooperative agreement (as opposed to the language re: the authority of § 120 to cleanup AVCRAD and CANG).[4] *City of Fresno v. United States,* 709 F.Supp.2d 888, 905 (E.D.Cal.2010).

The Memorandum Decision referenced the NPL when analyzing the relevant case law, including *Pollack v. U.S. Dep't of Defense,* 507 F.3d 522 (7th Cir.2007), *Fort Ord Toxics Project, Inc. v. Cal. EPA,* 189 F.3d 828 (9th Cir.1999), *Shea Homes Ltd. P'ship v. United States,* 397 F.Supp.2d 1194 (N.D.Cal.2005), and *City of Moses Lake v. United States,* 416 F.Supp.2d 1015 (E.D.Wash.2005). However, any discussion of the NPL was limited to harmonizing the facts of this case with *Pollack, Fort Ord, Shea Homes,* and *Moses Lake,* four cases addressing the NPL in the context of §§ 104, 113(h), and 120:

> Applying *Pollack,* § 120 'merely supplements the existing CERCLA regime by bringing federal property owners up to the same standards as private owners; it does not create a separate system for the feds.' *Id.* at 525. Under *Pollack,* § 120 does not provide a separate grant of authority beyond the facts of *Fort Ord.* Assuming, arguendo, that AVCRAD and/or CANG changes the OHF to a 'currently operated federal facility,' the OHF would still be characterized as a 'non-NPL federal property,' not being remediated by the EPA, similar to *Pollack* and *Shea Homes* (two § 104 cases). This line of authority does not support the City's position. Here, the OHF is properly classified as a 'non-NPL non-federal property,' which on the spectrum of 113(h) cases is one degree from *Pollack* and *Shea Homes* (non-NPL federal property) and two degrees from *Fort Ord* (NPL federal property) [ . . . ]

---

**4.** CANG refers to the "California Air National Guard," and AVCRAD denotes the "California Aviation Classification Repair Depot."

The City fails to reconcile the relevant case law, including *Pollack, Shea Homes, Moses Lake, and OSI, Inc. v. United States,* 525 F.3d 1294 (11th Cir. 2008). They involved materially different issues from the one in this case. *Pollack, Shea Homes* and *OSI, Inc.* dealt with whether 113(h)'s jurisdictional bar applied to federal facilities that were not listed on the NPL and/or did not involve the EPA. Conversely, *Fort Ord* [...] dealt with a federal facility that was listed on the NPL and involved the EPA. The OHF is a non-NPL non-federal property with no EPA involvement.

*City of Fresno v. United States,* 709 F.Supp.2d at 903–04.

The City's arguments are unpersuasive. The Memorandum Decision expressed no view on whether listing on the NPL was a prerequisite to finding a cleanup under § 120. Rather, it noted that the remediation site in this case was not listed on the NPL, did not involve the EPA, and, in that respect, was unlike *Fort Ord* and *Moses Lake,* two cases cited by the City. The analysis ended there. Given the language of the Memorandum Decision, it is difficult to understand the City's arguments, which are misleading and deficient in their failure to address the Cooperative Agreement's provisions.[5] The motion in this regard is DENIED.

### 2. *"Ample Factual Basis"*

■ The City next argues that there existed an "ample factual basis" to conclude that CANG and AVCRAD are part of the cleanup, leading to a § 120 cleanup, not § 104.[6] Specifically, the City alleges

5. The City contends that CANG/AVCRAD locations are "prime examples" of § 120 cleanups that were not listed on the NPL. The Memorandum Decision is silent on this point. In a footnote, however, the Memorandum Decision contrasted the language of the CANG/AVCRAD properties with that of the "remediation site" and OHF cleanup: "The language used to incorporate § 120–for the AVCRAD and CANG cleanup-differs from the language used in the OHF–RAP and Cooperative Agreement to remediate the OHF." *City of Fresno v. United States,* 709 F.Supp.2d at 902, fn. 12. No opinion was expressed on whether the CANG/AVCRAD cleanup exemplified a § 120 cleanup on federal property (not listed on the NPL). The City's "prime example" argument also raises the following questions: if the CANG/AVCRAD cleanup was selected under § 120, why was the OHF cleanup selected under *different* language, i.e., why did the parties rely on E.O. 12580, § 104, and the DERP/FUDS program to select the OHF cleanup? (*Compare* Doc. 45–6 at ¶4.1 ("The National Guard Bureau and the USACE enter into this Agreement pursuant to CERCLA/SARA, the NCP, Executive Order (EO) 12580, and DERP.") *and id.* at ¶ 13.3 ("The authority of the National Guard Bureau to exercise the delegated authority of the President of the United States pursuant to CERCLA and E.O. 12580, is not altered by this

Agreement, except to the extent mandated by CERCLA section 120(a).") *with id.* at ¶ 5(ag) (defining the remediation "site" as "the area set forth as 'Old Hammer Field" on the map included as Appendix C and any area off OHF to or under which a release of hazardous substances has migrated, or reasonably threatens to migrate, from a source on or at OHF.").) The City does not address this inconsistency, electing to argue—on a motion for reconsideration—that its RCRA claim survives because "the 'facility' necessarily includes the reach of contamination from the current federal operations, and the cleanup continues to be conducted under Section 120." The City's theory ignores the language of the RAP/Cooperative Agreement, relies on new arguments/facts, fails to harmonize existing case law, and refers to the "inclusion of the NPL" as an "interesting" question.

6. The analysis assumes that AVCRAD/CANG's presence at the OHF airfield *generally* transmutes the targeted remediation site to a "facility" under § 101(9). In its opposition, however, the government notes: (1) the remediation site is separate and distinct from the AVCRAD/CANG facilities, and was so defined in the RAP; and (2) § 120 makes clear that "federal facilities" are limited to facilities that are owned or operated by the federal

that the term "federal facility" is not limited to "the footprint of the federally-occupied building or grounds [ . . . ] instead, facility is defined [ ] as any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." To support its arguments, the City relies on the term "facility" as defined in CERCLA § 101(9), 42 U.S.C. § 9601(9).[7]

Until this motion for reconsideration, the City never raised or discussed CERCLA § 101(9).[8] In responding to the United States' original and renewed motions, the City did not reference CERCLA's definition of "facility," nor did it discuss its relevance to the § 113(h) analysis. The City does not provide any justification as to why it could not, and did not, previously present its argument in response to the original or renewed motions. Nor does the City explain why it did not request to file supplemental briefing on this issue prior to the issuance of the Memorandum Decision.

■ In this Circuit, matters that were not presented in the first instance by a

well-represented party are not considered on a motion for reconsideration. *See 389 Orange Street Partners v. Arnold,* 179 F.3d 656, 665 (9th Cir.1999). The expectation is that counsel will raise the issues that are to be decided, as the Court cannot be expected to anticipate a party's position. *See, e.g., United States v. Rahmani,* No.01–CR–00209–RMT, 2009 WL 449083 at 1 (C.D.Cal. Feb. 20, 2009). As made clear by the Ninth Circuit, a motion for reconsideration "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona Enter., Inc. v. Estate of Bishop,* 229 F.3d 877, 890 (9th Cir.2000). The City's unexplained, belated attempt to challenge the characterization of the OHF cleanup is not grounds to modify the April 22, 2010 Memorandum Decision, because the City waived this argument by failing to present it in either of its two lengthy oppositions.[9] As has now become a pattern, it was not raised prior to the April 22, 2010 Memorandum Decision and is foreclosed under well-established Ninth Circuit precedent.

---

government. Applied to the facts of this case, the government observes that an off-site federal facility does not transmute the character of an existing cleanup based on allegations of downgradient contamination. According to the government, the City's analysis ignores the cooperative agreement, the FUDS/DERP statute, and existing case law.

7. 42 U.S.C. § 9601(9) provides, in relevant part:
 The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.
 *Id.*

8. To support its arguments, the City also relies on: (1) CANG and AVCRAD are represented on the OHF Steering Committee since the 1990's; (2) CANG and AVCRAD contaminated the OHF site; and (3) the United States recently advanced a CERCLA claim against the City and Boeing for remediation work it performed at the CANG property. These evidence/arguments were either advanced in its original briefing or could have been raised at that time. They are therefore not new matter. *See Kona Enter., Inc. v. Estate of Bishop,* 229 F.3d 877, 890 (9th Cir.2000) (citations omitted)

9. Nor did the City advance CERCLA § 101(9) during the two rounds of oral argument on the United States' motion to dismiss the RCRA claim (December 3, 2007 and March 22, 2010).

Even considering the substance of the City's arguments, its latest challenge has no merit. First, the City does not explain how its § 101(9) arguments alter the existing § 104 remedial action selected in the operative agreements/action plans. Second, the case law does not mandate a different result.

The initial infirmity with the City's position is that it does not connect § 101(9)'s "facility" language to the existing remedial cleanup at the OHF. For example, while it is true that § 101(9) broadly defines "facility" for CERCLA purposes, the City does not explain why § 101(9)'s language controls the § 113(h) analysis. Assuming, *arguendo,* that the AVCRAD/CANG's operations convert the entire OHF into a "federal facility," the cleanup still lacks the "separate grant of authority" found in *Fort Ord* and *Moses Lake,* two § 120 cases.[10] In this context, *OSI, Inc. v. United States,* 525 F.3d 1294 (11th Cir.2008) is instructive. There, as here, the plaintiff argued that its RCRA claim survived a § 113(h) challenge because *all* remedial actions at federal facilities are selected under § 120, not § 104. The Eleventh Circuit disagreed:

> OSI argues remedial actions on federal facilities are "selected under" § 9620— not § 9604—and therefore are not subject to § 9613's jurisdictional bar because § 9620 is the exclusive source of authority for cleanups on federal lands. While § 9620's discussion of federal facilities is extensive, we have searched the language of the section in vain for a general authorization for the federal government to engage in remedial actions on federal facilities. The only lan-

guage approaching such a grant of authority is in § 9620(e), which, as stated above, says a department 'shall' engage in remedial investigation and action, but only after the site has been included on the NPL. Section 9620 contains no language authorizing any remedial activity if the site is not listed on the NPL. It is undisputed that the OU–1 site has not been placed on the NPL. The only language authorizing remedial actions on such sites is found in § 9604, the language of which is broad enough to be read as an authorization for all remedial actions, regardless of the land upon which the action takes place. Therefore, we hold the Air Force's remedial action for OU–1, a federal facility not listed on the NPL, was 'selected under' § 9604 and is subject to the jurisdictional bar of § 9613(h). The district court lacked jurisdiction to hear OSI's RCRA citizen suit while the remediation is ongoing. *See Alabama v. EPA,* 871 F.2d [1548] at 1560 [ (11th Cir.1989) ].

*Id.* at 1298–99.

The Eleventh Circuit in *OSI, Inc.* further reasoned that "[w]here a federal facility is not listed on the NPL, the only language authorizing remedial or removal actions is found in § 9604":

> Our view of § 9613(h) for federal facilities not listed on the NPL comports with the view of the Seventh Circuit [in *Pollack v. U.S. Dep't of Defense,* 507 F.3d 522, 525–27 (7th Cir.2007) ]. The only other Circuit to address the jurisdictional bar for federal facilities and the source of authority for remedial actions is the Ninth Circuit in *Fort Ord Toxics Project, Inc. v. California EPA,* 189

---

**10.** The cooperative agreement defines "federal facilities" as "the Fresno Air National Guard Base and the Army National Guard Shields Avenue Facility and the real property, located at FAT, subject to the jurisdiction of the 144th Fighter Interceptor Wing and/or Army National Guard Shields Avenue Facility Commanding Officers, respectively, as identified in Appendix C." (Doc. 45–6 at ¶ 5(k)). The City's arguments do not reconcile the cooperative agreement's "federal facility" definition with § 101(9).

F.3d 828 (9th Cir.1999), which held challenges to federal site cleanups were not subject to § 9613(h)'s jurisdictional bar. As the court in *Pollack* noted, however, *Fort Ord* is distinguishable because there the federal facility was listed on the NPL. Where a federal facility is not listed on the NPL, the only language authorizing remedial or removal actions is found in § 9604; such actions therefore are subject to the jurisdictional bar of § 9613(h) because the remediation is "selected under section 9604." 42 U.S.C. § 9613(h).

*Id.*

Cutting against the City's arguments is that its restyled § 113(h) analysis involves but a single step: is the remediation site part of a larger "facility" under § 101(9)? Such a limited query ignores the 113(h)

factors analyzed in *Fort Ord, OSI, Inc., Pollack, Shea Homes,* and *Moses Lake.*[11] To varying degrees, these cases recognized the importance of the NPL, property ownership, EPA involvement, prior contractual language, and whether the cleanup was part of the DERP/FUDS process, among other factors.[12] The City's test ignores these factors in favor of § 101(9), which has never been applied in the § 113(h) context. Moreover, the City overlooks the language of the Cooperative Agreement, which provided that the cleanup advanced under the FUDS/DERP statute and E.O. 12580, not § 120. The City does not attempt to reconcile its § 101(9) theory with either the relevant case law or the controlling Cooperative Agreement.

Additionally, the City's cited cases have nothing to say about whether a remedial action proceeds under § 104 or § 120. In

**11.** Critical to the analysis, the City does not address *Shea Homes Ltd. P'ship v. United States*, 397 F.Supp.2d 1194, which held:

> In this case, however, the site at issue is not included on the National Priorities List and the EPA is not involved. As a result, authority to undertake the clean up has been delegated to the Secretary of Defense. See Section 104 of CERCLA, 42 U.S.C. § 9604 (authorizing the President to act in response to releases of hazardous wastes); Exec. Order 12580 at § 2(e) (delegating authority under § 104 to the Department of Defense with respect to contamination on Defense Department facilities); see also Def.'s Ex. 21 at 2.
>
> Thus the rationale underlying the holding in *Fort Ord*-the creation of a separate authority in § 120 for the Administrator to conduct remedial actions at federal facilities—is simply not applicable here. *Fort Ord*, of course, did not have occasion to address the relationship between § 120 and § 113(h) in cases, such as this, where the clean up is not being conducted pursuant to the Administrator's authority. Given however, that *Fort Ord* carved out an exception to the general jurisdictional bar in § 113(h), the Court is not persuaded that it is appropriate to extend *Fort Ord* beyond the clear rationale and facts of that case. As such, it

> rejects Plaintiff's contention that this case is governed by *Fort Ord*, and concludes that the response actions in this case were authorized by § 104 and thus are governed by § 113(h).
>
> *Id.* at 1203.

**12.** In its opposition, the government expanded on the importance of the DERP/FUDS program in the context of this case:

> There is no dispute that the Corps is conducting its response action under its FUDS program. The Corps conducts its FUDS cleanups pursuant to 10 U.S.C. § 2701(c)(1)(B), which authorizes the Defense Environmental Restoration Program ("DERP"). That statute implements the CERCLA Section 104(a) cleanup authority which Congress delegated to the President. In Executive Order 12580, the President delegated cleanup authority with respect to formerly used defense sites to the Secretary of Defense. The relevant language of the Cooperative Agreement is consistent with the conclusion that the cleanup of Old Hammer Field is being undertaken pursuant to Section 104, Executive Order 12580, and the DERP/FUDS program [...] In fact, there is no such thing as a FUDS cleanup selected under Section 120.
>
> (Doc. 287 at 4:7–4:21) (citations omitted).

particular, the cited authorities were limited to analyzing CERCLA § 103 (*Sierra Club v. Seaboard Farms, Inc.*, 387 F.3d 1167, 1175 (10th Cir.2004)), § 106(a) (*United States v. Tropical Fruit, S.E.*, 96 F.Supp.2d 71 (D.P.R.2000)), and § 107 (*Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1074 (9th Cir.2006); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1151 (1st Cir. 1989)). These authorities never reached the issue of whether a late-developing, off-site § 101(9) "facility" transmutes an existing § 104 cleanup to one under § 120, especially in light of the scope and specificity of the Cooperative Agreement.

To be clear, whether § 120 provides a separate grant of authority for the President to initiate cleanups of federal sites beyond the facts of *Fort Ord* need not be resolved here. It is enough to note the Seventh and Eleventh Circuit's decisions in *Pollack* and *OSI, Inc.*, distinguish the facts and "separate grant of authority" of *Fort Ord* and *Moses Lake*, and analyze the specific facts of this case under existing case law. Contrary to the City's assertions, the sheer consistency of cases analyzing EPA involvement and/or listing on the NPL on a § 113(h) challenge requires an examination of these two factors. *See, e.g., Fort Ord Toxics Project, Inc.*, 189 F.3d 828, 833–34 (relying on the undisputed fact that the clean up at issue was a remedial action being conducted by EPA pursuant to the grant of authority created by § 120).

The City's post hoc reasoning ignores the analysis contained in the April 22, 2010 Memorandum Decision. The entire record reveals that CERCLA § 104 applies to the OHF cleanup, not § 120.[13] Further, the City offers no response to several of the questions posed in the April 22, 2010 Memorandum Decision, instead offering a series of arguments based on the 20–20 vision of hindsight in an exercise of Monday morning quarterbacking.[14]

Also weighing against the City is that the parties are conducting—and funding—a remediation program at the OHF in conjunction with the State of California, which has oversight over the remediation through the DTSC and RWQCB. Although the City minimizes the impact of its proposed injunctive relief, any judicial intervention necessarily imposes on the DTSC and RWQCB, the agencies supervising the remediation and investigating

---

**13.** Here, the cleanup proceeds under E.O. 12580 and the DERP/FUDS statute, implicating § 104 not § 120. Moreover, there is no EPA involvement and the site is not listed on the NPL. These two factors drove the analysis in *Fort Ord* and *Moses Lake*. *See Fort Ord*, 189 F.3d at 833–34 (relying on the undisputed fact that the clean up at issue was a remedial action being conducted by EPA pursuant to the grant of authority created by § 120); *see also City of Moses Lake v. United States*, 416 F.Supp.2d at 1021 (relying on the EPA's involvement, placement of the site on the NPL, and the interagency agreement stating "that the EPA and the Army enter into this Agreement pursuant to their respective authorities contained in Sections 101, 104, 107, 120 and 122 of CERCLA.") (internal quotations omitted). Although not dispositive of the inquiry, the absence of these factors—EPA involvement and listing on the NPL—casts doubt on a § 120 finding. *See OSI, Inc.*, 525 F.3d at 1299; *see also Pollack*, 507 F.3d at 525–27.

**14.** Specifically, the City ignores two questions posed in the April 22, 2010 Memorandum Decision: (1) why would the cooperative agreement cite E.O. 12580 and the DERP statute if the cleanup was proceeding under § 120?; and (2) How can a FUDS cleanup—which is, by definition, authorized under § 104—be covered under § 120? *See Loughlin v. United States*, 286 F.Supp.2d 1, 5 (D.D.C.2003) (stating that FUDS project was "conducted under the authority of the Defense Environmental Restoration Program (DERP), 10 U.S.C. §§ 2701–2707, and Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq.").

any alleged environmental hazards.[15] In contrast to cases such as *Maine People's Alliance and Natural Resources Defense Council v. Mallinckrodt, Inc.,* 471 F.3d 277, 287 (1st Cir.2006), there is no evidence that any state agency has disregarded its duty to oversee the OHF remediation or to evaluate whether contaminants may present an endangerment to the health or the environment at the OHF. Rather, the opposite is true. (See, e.g., Doc 45–5, the DTSC's October 4, 1994 "Imminent or Substantial Endangerment Determination and Order" to Rockwell International (Boeing's predecessor); Doc 45–12, the DTSC's October 31, 2006 "Imminent or Substantial Endangerment Determination and Order"; Doc. 255–4, the CDHS's letter requesting that the City remove Well 63 from its water system; Doc. 255–6, the State of California's PHG for TCP, published in August 2009; Doc. 281–3, email from Carl Carlucci, Regional Director of CDPH, to Lon Martin re: MCL timeline.)

In this context, the April 22, 2010 Memorandum Decision's discussion of the conflict between the City's proposed injunctive relief and the ongoing remediation is fully applicable:

> [T]he State of California, through the DTSC and RWQCB, has oversight over the remediation and has the scientific understanding and resources necessary to investigate and remediate alleged hazards. Conversely, the district court has neither the resources nor expertise necessary to properly address the scientific issues presented by an alleged imminent and substantial endangerment to health or the environment.

> These concerns are shared by a number of district courts throughout the United States. *See West Coast Home Builders,*

*Inc. v. Aventis Cropscience USA Inc.,* No. 04–2225–SI, 2009 WL 2612380 (N.D.Cal.2009) ("There are two fundamental problems with plaintiff's RCRA claim [ . . . ] [f]irst, the Consent Order already requires GBF/TRC to clean up the groundwater contamination, and that remediation has been underway for years [ ] Plaintiff seeks relief that it is already obtaining outside of this lawsuit."); *see also River Vill. W. LLC v. Peoples Gas Light and Coke Co.,* 618 F.Supp.2d 847, 854–55 (N.D.Ill.2008) ("Unlike the district court, the [agency] has been specifically charged with the responsibility to develop and enforce regulations to implement the environmental laws passed by Congress [ . . . ] the district court's handling of this matter would be delayed by years if research and discovery which would be necessary to develop a basic understanding of the [contamination area and hazards presented]."); *OSI, Inc. v. United States,* 510 F.Supp.2d 531 (M.D.Ala. 2007) ("OSI has presented no [ ] evidence to suggest that an imminent or substantial endangerment to health or the environment exists on OSI or Government property. Furthermore, the Government is conducting a remediation program in conjunction with ADEM to repair any contamination and resulting dangers that do exist [ . . . ] [t]hese two factors together lead the Court to conclude that the Government is entitled to summary judgment."); *Davis Bros., Inc. v. Thornton Oil Co.,* 12 F.Supp.2d 1333, 1338 (M.D.Ga.1998) ("[P]laintiff has presented no credible evidence supporting a finding of imminent and substantial endangerment to health or the environ-

---

**15.** Critically, the RAP defines the remediation "site" as: "the area set forth as 'Old Hammer Field" on the map included as Appendix C and any area off OHF to or under which a

release of hazardous substances has migrated, or reasonably threatens to migrate, from a source on or at OHF." (Doc. 45–6 at ¶ 5(ag).)

ment [. . .][m]oreover, the proposed remedy of injunctive relief is moot because Conoco has already agreed to remediate the site and pay for any costs associated with the cleanup, and the state is overseeing the cleanup more effectively than the court ever could. Thus, the RCRA claim fails on the merits, and is also moot."). This language applies with equal force to this case.

*City of Fresno v. United States,* 709 F.Supp.2d at 907.

The City simply overreaches in an area where further judicial intervention is not required. The City's motion for reconsideration is DENIED.

16. Whether the City's request for relief is a "challenge" to the current remedial action plan was resolved in the April 22, 2010 Memorandum Decision. As stated in the Memorandum Decision, the City's arguments have been rejected by the Ninth Circuit in *McClellan Ecological Seepage Situation ("MESS") v. Perry,* 47 F.3d 325, 330 (9th Cir.1995) and *Razore v. Tulalip Tribes,* 66 F.3d 236 (9th Cir.1995). In *MESS,* the Ninth Circuit took a broad view of the scope of § 113(h). There, the plaintiffs made an argument similar to that advanced here: that their RCRA claim was not a "challenge" under § 113(h) because it was not attempting to delay or modify the remedy, but rather only sought to compel the defendant's compliance with RCRA's requirements. *Id.* at 330–31. The Court held that while tangentially related claims, such as those to enforce minimum wage requirements, do not constitute a challenge under § 113(h), the plaintiffs' claim was "far more directly related to the goals of the cleanup itself." *Id.* at 330. The Court also concluded that for "all practical purposes" the plaintiffs were effectively seeking to "improve" the clean up. *Id.* As such, it found that the plaintiff's claim was a "challenge" barred by § 113(h). *Id.*

*MESS, Razore,* and *SPPI–Somersville, Inc. v. TRC Companies, Inc.,* 2009 WL 2612227 control the facts of this case. In *SPPI–Somersville,* Plaintiffs contended that the current remediation plan did not address the danger posed by vapor intrusion, and thus that the RCRA injunctive relief was viable. The court rejected this argument:

### 3. *1,2,3—trichloropropane ("TCP")*

◼ The substance of the City's next argument is that the April 22, 2010 Memorandum Decision "underestimate[d] the impact of TCP at FAT." According to the City, its Rule 59 motion is sound because TCP presents an "imminent and substantial endangerment" and its request for relief is not a "challenge" to the current remedial action plan. The United States rejoins that the City does not present any "newly discovered" evidence and, even if it did, its evidence does not establish an "imminent and substantial endangerment" as that term is defined by 42 U.S.C. § 6972(a)(1)(B).

Assuming, *arguendo,* that § 113(h) does not bar the City's entire RCRA claim,[16] and that it is not otherwise foreclosed,[17]

There are a number of problems with this assertion. First, even if the Court granted the relief that plaintiffs describe in their papers regarding soil vapor, such as ordering TRC to conduct a study of the site-specific soil gas conditions, DTSC would necessarily be involved in that process, and would make the determination as to whether mitigation was necessary.

*Id.* at *15.

This language applies with equal force to this case. The City rejoins that the proposed injunctive relief merely "supplements" the existing cleanup. However, any judicial order adding an additional contaminant necessarily imposes on the currently cleanup and impacts the DTSC and RWQCB. It also raises a number of practical and administrative concerns. *See, e.g., River Vill. W. LLC,* 618 F.Supp.2d at 854–55 ("Unlike the district court, the [agency] has been specifically charged with the responsibility to develop and enforce regulations to implement the environmental laws [. . .] the district court's handling of this matter would be delayed by years if research and discovery which would be necessary to develop a basic understanding of the [contamination area and hazards presented].")

17. Specifically, whether under the primary jurisdiction doctrine, the administrative forum provided by the State of California is the appropriate forum for resolution of the City's claims concerning the cleanup of the OHF. There is also an argument that the City's RCRA claim is moot.

the City's motion fails because it does not satisfy the imminent and substantial endangerment element of its RCRA claim. RCRA provides for citizen suits "against any person ... who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Under this section, "[a]n endangerment can only be 'imminent' if it 'threatens to occur immediately.'" *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) (quoting Webster's New International Dictionary of English Language 1245 (2d ed. 1934)). "[T]his language 'implies that there must be a threat which is present now, although the impact of the threat may not be felt until later.'" *Id.* (quoting *Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994)). To show an "imminent and substantial" threat, the plaintiff must do more than establish the presence of solid or hazardous wastes at a site. *Foster v. United States*, 922 F.Supp. 642, 661 (D.D.C.1996). Instead, "endangerment must [be shown to] be substantial or serious, and there must be some necessity for the action." *Price*, 39 F.3d at 1019. Also, the fact that remedial activity in accordance with CERCLA has commenced at a site greatly reduces the likelihood that a threat to health or the environment is imminent. *See Christie–Spencer Corp. v. Hausman Realty Co., Inc.*, 118 F.Supp.2d 408, 419–23 (S.D.N.Y.2000).

To establish imminent and substantial endangerment, the City submits TCP test results from 2002 and 2009. According to the City, in 2002, it sampled Well 63 for TCP. The samples indicated TCP levels of more than 100 times the regulatory action/notification level, specifically 0.67 parts per billion.[18] The City conducted further sampling of TCP levels at the OHF in December 2009. The City states that the December 2009 samples revealed TCP levels ranging from .16 to .95 parts per billion at locations downgradient from where the United States historically or currently operates, including Well 70. The 2009 samples also detected TCP levels at Well 63 at concentrations of .3 parts per billion, which is 60 times the action level set by the CDHS.

The City further relies on the fact that two California agencies established non-binding environmental standards concerning TCP. First, in 1999, the California Department of Health Services ("CDHS") established a notification level for TCP of 0.005 parts per billion (5 parts per trillion).[19] The CDHS also set a "response level" for TCP, which is the level at which the State recommends taking a drinking water source out of service. Currently, the response level is 100 times the notification level. Second, the California Office of Environmental Health Hazard Assessment ("OEHHA") set a public health goal ("PHG") for TCP of 0.007 parts per billion (7 parts per trillion).

It is undisputed that California recognizes TCP as a carcinogen. It is similarly beyond dispute that TCP is an "unregulated contaminant" and the basis for the notification level was TCP's cancerous effect on laboratory animals. *See* www.cdph.ca.gov/certlic/drinkingwater/Pages/123tcp.aspx, ("1,2,3–TCP causes cancer in laboratory animals (U.S. EPA, 1997),

---

**18.** On March 1, 2004, the State of California requested that the City remove Well 63 from its water system due to excessive levels of TCP. The City removed Well 63 from the water system shortly thereafter.

**19.** The CDHS is now known as the California Department of Public Health ("CDPH").

which is the basis for the notification level" and "[the CDPH] adopted a regulation that included [TCP] as an unregulated contaminant for which monitoring is required.") (last visited June 21, 2010). The parties also recognize that "the likely timeline for the development and adoption of the MCL [for TCP] is at least 4 years from now." [20] (See Doc. 281–3, Email from Carl Carlucci, Regional Director of CDPH, to Lon Martin, the Assistant Director of the Public Utilities Department for the City of Fresno.) The parties dispute the importance and meaning of the four-year regulatory timeline.[21]

The final item of evidence advanced by the City is the deposition transcript of Dr. Robert J. Sterrett, a hydrogeologist retained by the City to opine on the sources and migration patterns of VOCs at the OHF. On December 30, 2009, the City submitted Sterrett's signed expert report, which was supplemented on January 29, 2010. (Docs. 191–5 through 191–8 and 195–6.) However, Sterrett did not opine that TCP is "an imminent and substantial endangerment to health or the environment" in his expert or supplemental reports. Rather, Sterrett expressed his "expert opinion" for the first time at his February 2, 2010 deposition.

In sum, the City argues that the TCP levels exceeding the State's non-binding standards, taken in combination with the Sterrett's expert testimony, present a genuine dispute of fact on whether TCP presents an imminent and substantial endangerment to public health at the OHF. The

City's TCP arguments entail both the "clear error" and "newly discovered evidence" grounds of Rule 59(e).

The government responds that the City fails to meet its Rule 59 burden because the evidence is not "newly discovered." The government contends that the sampling results and Sterrett's deposition transcript could have been presented in the City's oppositions or filed as a supplement, but were not. While the government acknowledges that the City introduced portions of its TCP evidence at oral argument, it characterizes this action as "hasty" and observes that the City failed to supplement its briefing or expert reports.

■ In this Circuit, matters not presented in the original briefing are not considered on a motion for reconsideration. *See 389 Orange Street Partners v. Arnold,* 179 F.3d 656, 665. A motion for reconsideration "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona Enter., Inc. v. Estate of Bishop,* 229 F.3d 877, 890. First, the City had an opportunity to file a detailed declaration delineating Sterrett's testimony following his February 2, 2010 deposition. The City declined to present the evidence in this form, preventing adverse parties from addressing it.[22] It is similarly unclear why the City introduced portions of the December 2009 TCP samples at oral argument on March 22, 2010, instead of via a court filing or declaration.[23]

---

**20.** Carlucci's email was in response to "a question [] about the timeline for the MCL development by Department of Public Health." (See Doc. 281–3.)

**21.** For example, the government argues that "the State's estimate that there will not be an MCL for TCP for at least four more years only confirms [] that there is no imminent and substantial endangerment to health or the environment at Old Hammer Field." (Doc. 287

at 11:15–11:16.) The City disputes the government's interpretation.

**22.** It is undisputed that the City did not supplement Dr. Sterrett's report to advance his opinions re: TCP, as required by Rule 26 of the Federal Rules of Civil Procedure.

**23.** At oral argument on June 14, 2010, the City's counsel stated that it presented portions

Even assuming, *arguendo*, that the City's Rule 59 motion is properly supported, its motion for reconsideration fails because it does not establish the seminal point, i.e., that the disposal of TCP at the OHF may present an imminent and substantial endangerment to health or the environment. The City was required to show more than that TCP exists at or near the OHF airfield. The risk of endangerment from the TCP contamination must be *imminent* for there to be a claim under RCRA. *See Crandall v. City and County of Denver, Colo.,* 594 F.3d 1231, 1237 (10th Cir.2010) (stating that "[o]ne essential point that Plaintiffs appear to overlook is that although the harm may be well in the future, the endangerment must be imminent.") (citation omitted). Moreover, the City's proffered evidence has failed to raise a genuine dispute of fact as to the seriousness of the risk posed by TCP. *See, e.g., Newark Group, Inc. v. Dopaco, Inc.,* No. 2:08–CV–02623–GEB–DAD, 2010 WL 1342268 at *7 (E.D.Cal. Apr. 2, 2010) ("Absent additional evidence, the mere fact that [plaintiff] has produced such samples does not support a reasonable inference that [the contamination on its Property] presents an imminent and substantial endan-

germent to health or the environment.") (citations and internal quotations omitted).

The inadequacy of the City's evidence is best demonstrated by the February 2, 2010 deposition testimony of Dr. Sterrett, which the City claims distinguishes this case from *Cordiano v. Metacon Gun Club, Inc.,* 575 F.3d 199 (2d Cir.2009).[24] At the outset, it is important to note the progression of Sterrett's "expert opinions" during the different stages of the case, i.e., first during expert disclosures, second, during his deposition, and, last, for the City's current motion for reconsideration. Sterrett's original expert report, filed December 30, 2009, contains a brief opinion on TCP, and it is qualified at best: "There are *apparently* at least two sources of 1,2,3–TCP in the vicinity of OHF. One is *probably* on the eastern portion of OHF and the other is between Wells 306 and 63." (See Doc. 191–5, "Sterrett's Expert Report," at pg. 28.) (emphasis added). Critical to the analysis, Sterrett excludes TCP as a contaminant causing an "imminent and substantial endangerment" at the OHF. The expert report provides, in relevant part:

> *Question:* Would the cessation of remedial activities result in an imminent

of the TCP evidence during March 22, 2010's oral argument because: "our goal for oral argument in 2010 [re: United States' RCRA motion] [was] to focus on what we briefed the court on for sake of simplicity and believing the court would probably reserve the imminent and substantial endangerment issue as a factual dispute more suited for resolution at trial and that is how we postured that particular motion and our response to it." The United States countered that "there have been a handful of opportunities of all parties to submit [evidence]" and that the City confirmed that it had presented all of its evidence at the close of the March 22, 2010 hearing date, when the matter was submitted for decision.

**24.** In *Metacon,* the Second Circuit affirmed summary judgment in favor of the defendants

on the plaintiff's RCRA claim. The court held that discarded lead at a gun club site did not present an "imminent and substantial endangerment to health or environment," and thus did not warrant injunctive relief under RCRA, despite the plaintiff's expert report that found that various samples drawn from site exceeded state thresholds for residential sites and concluded that lead represented potential exposure risk to humans and wildlife. *Id.* at 210–212. The court found that there was no triable issue of fact on "imminent and substantial endangerment" where the report did not state the degree of potential exposure to lead contamination on site, or provide any evidence that anyone was subject to long-term exposure to lead contamination at site, or that there were realistic pathways of exposure there. *Id.*

and substantial endangerment to health of the environment?

*Opinion:* The presence of TCE in groundwater in excess of MCLs results in a situation of imminent and substantial endangerment to health [sic] or the environment as outlined by the USEPA. This opinion is also supported by the fact that the DTSC has issued an Imminent and Substantial Endangerment Order.

(*Id.* at pg. 27.)

There is no opinion that TCP presents an imminent and substantial endangerment to health or the environment in Sterrett's expert report.[25]

Sterrett's February 2, 2010 deposition testimony is similarly flawed. Although he conclusorily recited § 6972(a)(1)(B)'s "magic words," Sterrett attributed TCP's "substantial and imminent endangerment" to the State's non-binding public health goal. The opinion was also qualified and did not state with specificity the degree of potential exposure to risk to humans and the environment or provide any evidence that anyone was subject to long-term exposure to TCP contamination or that there were realistic pathways of exposure at the OHF:

Q: But my question has to do with whether TCP in groundwater poses an imminent substantial endangerment, and I don't think you've answered that one yet.

A: I would have to say yes, just because I think if we let it go, the State of California would require capture of it.

Q: What's the basis of that opinion?

A: That because of its low public health notification.

Q: But the low public health notification only applies to water that's being put into the [ ] drinking system, correct?

A: That is correct.

Q: So if the TCP is just left in the groundwater below the surface and is not being removed to be put into drinking water, there would not be an imminent substantial endangerment, would there?

A: My understanding is the State of California, you know, just about all groundwater is going to be considered drinking water. So, you know, having it just migrate, I would suspect the State may see it differently.

Q: But it's—well, you don't recall the RAP, do you?

A: Well, the RAP was written, I think, before—before the TCP was probably an issue. I don't recall it being in there, but I'm not a hundred percent sure.

Q: So I guess you would say that you believe that perhaps the State of California may—may believe that the migration of TCP may pose an imminent substantial endangerment to [ . . . ] the health or the environment?

A: Yes.

(Doc. 256–14, Dep. of R. Sterrett, at 12:19–15:4.)

▮▮▮ This review of Sterrett's expert report and his deposition testimony demonstrate that the City's TCP arguments necessarily fail. Although the City's expert recited § 6972(a)(1)(B)'s "magic words," the deposition testimony adds nothing beyond the fact that TCP levels

---

25. This excerpt also demonstrates that Sterrett had notice of the presence of TCP at the OHF at the time of his expert report, but did not opine that TCP caused an imminent and substantial endangerment. In addition, Sterrett's January 29, 2010 supplemental report, filed four days before his expert deposition, did not include his opinion re: TCP.

exceed California's non-binding public health goals.[26] It lacks the factual detail and specific exposure evidence found sufficient in *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1020 (10th Cir. 2007) and *California Dept. of Toxic Substances Control v. Interstate Non–Ferrous Corp.*, 298 F.Supp.2d 930 (E.D.Cal.2003), two cases relied on by the City. *See Burlington*, 505 F.3d at 1020 (finding genuine issues of material fact existed on plaintiff's RCRA claim based on expert testimony defining the specific carcinogenic effect on industrial outdoor workers (based on soil concentrations), that materials "also pose a threat to pets and wildlife as they are completely exposed," and that the "presence of this exposed material and its eruptive nature constitutes a potential threat to stormwater runoff and waters of the United States."); *see also California Dept. of Toxic Substances Control*, 298 F.Supp.2d at 981–82 (relying on the DTSC's multiple scientific reports by qualified experts to hold that a triable issue of material fact existed on the issue of imminent and substantial endangerment.[27]). Additionally, Sterrett relied on DTSC's Imminent and Substantial Endangerment Order, dated October 31, 2006, to support his expert opinion. However, that order did not mention TCP and the DTSC has not since issued an "Imminent and Substantial Order" for TCP. The City does not provide a single case citation where such an order was analyzed and applied to support a "substantial and imminent endangerment" opinion in this context.[28]

**26.** The government did not object to Sterrett's TCP opinion on grounds that it violated Rule 702 of the Federal Rules of Evidence. However, under Rule 702 if the basis for an expert's opinion is clearly unreliable, the district court may disregard that opinion in deciding whether a party has created a genuine issue of material fact. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (if "the trial court concludes that the scintilla of [expert] evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to . . . grant summary judgment"). Relevant expert testimony is admissible only if an expert knows of facts which enable him to express a reasonably accurate conclusion. *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir.1988). Both the determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under Fed.R.Evid. 702. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**27.** The *California Dept. of Toxic Substances Control* court's summary of the plaintiff's expert testimony is instructive:

Based upon personal observation, high wind conditions, a review of the data contained in Chaney, Walton and McCall's Remedial Investigation report, and department policies relating to ISE designations, Mr. Kovac asserts "the Mobile Smelting Site and neighboring off-site areas constitutes a continuing imminent and substantial endangerment to human health and the environment." Doc. 957 ¶ 26, at 8. Mr. Kovac asserts the threat is neither remote or speculative in nature, nor de minimis in degree. Id. Mr. Kovac contends harm has already occurred and is not simply threatened, as contamination has been widely spread throughout the environment. Id. Additionally, the Site is an ISE because the remediation efforts performed to date include temporary actions which will fail if not renewed or made permanent. Id. ¶¶ 21–25 at 7–8. It is undisputed that soil and ash piles on site are covered with polymer coating that is 1/4 to 1/2 inches thick and the polymer coating is only a temporary cap, which must be renewed approximately every two years. UF 32. It also is undisputed that if the polymer is not renewed, "it will break down and the contaminated sod and ash on the site will be exposed to wind and rain, and the contamination can be spread."

298 F.Supp.2d at 981.

**28.** More convincing is the exchange between the government's counsel and Sterrett concerning his failure to include the TCP opinion in his original or rebuttal expert reports:

The City's remaining evidence is controlled by *Crandall v. City and County of Denver, Colo.*, 594 F.3d 1231, *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, and *Newark Group, Inc. v. Dopaco, Inc.*, 2010 WL 1342268. Those cases hold that absent additional evidence, the mere fact that a plaintiff has produced contaminant samples exceeding non-binding levels does not support a reasonable inference that the contamination presents an imminent and substantial endangerment to health or the environment. *See, e.g., Metacon Gun Club*, 575 F.3d at 212–13. Specifically, the *Newark Group, Inc.* court stated: "evidence that certain samples taken from the [the property] exceeded [government] standards simply provides an inadequate basis for a jury to conclude that federal law, specifically, [RCRA's citizen suit provision, § 7002(a)(1)(B),] [42 U.S.C.] § 6972(a)(1)(B), has been violated." 2010 WL 1342268 at *7. The City submits evidence that TCP was detected at or near the OHF, including Well 70, but at levels it essentially admits are far from immediate. The City's evidence lacks the "imminence"

or "threat" present in *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013 and *California Dept. of Toxic Substances Control v. Interstate Non–Ferrous Corp.*, 298 F.Supp.2d 930. This negates any "substantial and imminent" finding under the RCRA framework.[29]

The City has not offered any substantial evidence that the granting of the United States' motion was incorrect, nor has the City provided any new factual evidence to change the analysis. The City's motion for reconsideration is not supported by any circumstances justifying reconsideration. The City's motion for reconsideration is DENIED.

Even considering the evidence advanced in its Rule 59 motion, the City has not shown a genuine dispute of fact on whether TCP presents an imminent and substantial endangerment at the OHF. On the current record, its evidence is distinguishable from those cases finding a colorable claim under 42 U.S.C. § 6972(a)(1)(B), including *Burlington N. & Santa Fe Ry. Co. v. Grant* and *California Dept. of Toxic*

Q: On page 27 of your December 30, 2007 report--do you have that? Why didn't you include TCP in your opinion?

A: Certainly the emphasis of the October 31 document of 2006 from DTSC was primarily focused on these chlorinated solvents rather than TCP.

Q: You're referring to the October 31, 2006 DTSC issue, Imminent and Substantial Endangerment Order?

A: Right. And I think by extension of the fact that TCP has a fairly low action level, that this could be extended—TCP could be extended under this.

Q: Under what?

A: Imminent substantial endangerment.

Q: Well, as of today, has DTSC amended its Imminent Substantial Endangerment Order to include TCP?

A: Not that I'm aware of.

(*Id.* at 14:5–14:21.)

It is clear from this exchange that Sterrett based his TCP expert opinion on an extension of the DTSC's "Imminent and Substantial Or-

der," dated October 31, 2006. However, the Order did not mention TCP and the DTSC has not since issued an "Imminent and Substantial Order" for TCP.

29. It also appears that the purported endangerment of Well 63 is not actionable under RCRA because, under the City's own theory, the harm posed will never occur. Specifically, Well 63 was closed in 2004, therefore there is no imminent endangerment to future water users of Well 63. *See Price v. United States*, 39 F.3d 1011, 1019 (9th Cir.1994) (if no pathway of exposure, no imminent endangerment); *see also Scotchtown Holdings LLC v. Town of Goshen*, 2009 WL 27445 at *3 (S.D.N.Y.2009) ("Where the only endangerment alleged is to hypothetical occupants who under Plaintiff's own theory will never consume the allegedly contaminated water, and thus will not suffer adverse health effects from it, the case does not fit the narrow criteria set by Congress for citizen suits under RCRA.").

*Substances Control v. Interstate Non–Ferrous Corp.* The City also understates the prospect of establishing a second cleanup—of an unregulated contaminant—on an existing remediation site managed by several state agencies.

### B. *HSAA Claim*

The City's final Rule 59(e) argument relates to its claim under the Carpenter–Presley–Tanner Hazardous Substance Account Act ("HSAA"), Cal. Health & Safety Code § 25300 *et seq.,* the state law counterpart to CERCLA. Under HSAA, the DTSC authorizes the cleanup of sites within the state where chemical contamination represents a threat to human health or the environment. *Fireman's Fund Ins. Co. v. City of Lodi, Cal.,* 302 F.3d 928, 934 (9th Cir.2002).

Under CERCLA, departments · and agencies of the United States are subject to liability to the same extent as any nongovernmental entity. *United States v. Shell Oil Co.,* 294 F.3d 1045, 1052–53 (9th Cir.2002). Section 120(a)(1) explicitly waives the sovereign immunity of the United States with respect to CERCLA actions. *Id.* Regarding state laws governing hazardous waste response, § 120(a)(4) of the CERCLA statute addresses their application to the federal government:

> State laws concerning removal and remedial action, including State laws regarding enforcement, shall apply to removal and remedial action at facilities owned or operated by a department, agency, or instrumentality of the United States ... when such facilities are not included on the National Priorities List. The preceding sentence shall not apply to the extent a State law would apply any standard or requirement to such facilities which is more stringent than the standards and requirements applicable to facilities which are not owned or

operated by any such department, agency, or instrumentality.

42 U.S.C. § 9620(a)(4) (emphasis added).

The law regarding waivers of the sovereign immunity of the United States is straightforward. Absent an express waiver, "the activities of the federal government are free from regulation by any state." *United States v. State of Wash.,* 872 F.2d 874, 877 (9th Cir.1989) (quoting *Mayo v. United States,* 319 U.S. 441, 445, 63 S.Ct. 1137, 87 L.Ed. 1504 (1943)). Any waiver of United States sovereign immunity must be unequivocal; it cannot be implied. *United States Dep't of Energy v. Ohio,* 503 U.S. 607, 615, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992). Such a waiver "must be construed strictly in favor of the sovereign and not enlarged beyond what the language requires." *Ohio,* 503 U.S. at 615, 112 S.Ct. 1627 (citations and quotations omitted). Furthermore, only Congress can waive the sovereign immunity of the United States. *Cal. v. NRG Energy Inc.,* 391 F.3d 1011, 1023–24 (9th Cir.2004); *Tucson Airport Auth. v. Gen. Dynamics Corp.,* 136 F.3d 641, 644 (9th Cir.1998). It must do so explicitly in statutory text. *United States v. Nordic Village, Inc.,* 503 U.S. 30, 37, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) ("[t]he 'unequivocal expression' of elimination of sovereign immunity that we insist upon is an expression in statutory text.").

In its original motion, the United States claimed that none of the remediation is taking place on a federally owned or operated facility, therefore § 120(a)'s waiver provisions do not apply. The City, in contrast, argued that the leased AVCRAD and CANG leasehold—separate and distinct from the remediation site—converted the entire OHF into a "facility owned or operated by the federal government." According to the City, it satisfied *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937,

1949, 173 L.Ed.2d 868, because it "alleged in its SAC that the response costs were incurred at property that is currently owned or operated by the United States."

On April 22, 2010, the United States' motion was granted on grounds that the City did not sufficiently allege that AV-CRAD/CANG's presence at the OHF airfield *generally* waived its sovereign immunity under § 120(a) of CERCLA:

> The City's primary argument fails on the specific facts of this case, as the OHF remediation is taking place on property owned by the City, not the federal government. (See SAC, Doc. 123–3, ¶ 5 ("The City, which is involved solely because it owns the property the Defendants contaminated [ . . . .]"; Doc. 123–3 at ¶38 ("[The United States] continues to lease property from the City [ . . . .]") [ . . .] Moreover, the exhibits/maps attached to the SAC demonstrate that the remediation site is separate and distinct from AVCRAD and CANG, i.e., the alleged "current federal operations." (See Docs. 123–4 through 123–6; Doc. 123–3, ¶ 34.) The mere presence of the AVCRAD and CANG facilities—on the OHF airfield generally—does not transmute the entire cleanup into a remedial action at a 'federally owned or controlled' facility; such unaffiliated federal facilities are outside the scope of § 120(a)(4) [ . . .]
>
> The City does not sufficiently allege that there is a remedial action at a 'facility' owned or operated by the federal government. See *Iqbal*, 129 S.Ct. at 1950 ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss [ . . .] where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief."). The City has failed to state facts sufficient to state a claim under the HSAA. A claim is plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, — U.S. —, —, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929.). The SAC's third cause of action under the HSAA does not meet this standard. See *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir.1996) ("Conclusory allegations and unwarranted inferences are insufficient to defeat a motion for judgment on the pleadings."). The United States' motion is GRANTED.

*City of Fresno v. United States*, 709 F.Supp.2d at 912–14.

In a footnote, it was reasoned that the City fused two distinct terms under the CERCLA framework:

> [T]he City conflates two distinct definitions/operations: (1) federal operations/facilities, generally; and (2) removal or remedial actions at 'facilities owned or operated by a department, agency, or instrumentality of the United States.' 42 U.S.C. § 9620(a)(4) (emphasis added). Here, the City acknowledges that the United States does not own—or conduct operations—at the remediation site. Instead, it alleges that the United States' adjacent operations—on the larger OHF airfield—constitute applicable 'facilities' under § 9620(a)(4).

*Id.* at 912–13, fn. 22.

In its motion for reconsideration, the City does not allege that the controlling law has changed since the Memorandum Decision. Rather, it argues there was "clear error" in the Court's interpretation of both the law and facts of this case.

 The basis for the City's current motion is that the Court erred when it held that the City did not sufficiently allege that the remedial action at issue is taking place at a facility owned or operat-

ed by the government. According to the City, the court did not follow the appropriate legal standard for ruling on a Rule 12(c) motion because the court failed to "take as true" certain "factual allegations" made by the City in its second amended complaint, including: (1) that the federal government "owns" or "operates" the entire OHF based on alleged downgradient contamination from AVCRAD/CANG. However, this is a legal argument, not a factual assertion. Rule 12 does not require the court to take the City's legal arguments as true, or to construe them in its favor.

 To support its theory, the City makes a variety of new legal arguments and repeats arguments already rejected by the Memorandum Decision. However, any newly alleged "facts" raised in the City's motion for reconsideration are ignored. *See Fay Corp. v. BAT Holdings I, Inc.*, 651 F.Supp. 307, 308–09 (W.D.Wash.1987). The City may not use reconsideration as a means to present arguments that could, and should, have been made before the Memorandum Decision was issued. *See, e.g., 389 Orange Street Partners v. Arnold*, 179 F.3d at 665. A motion for reconsider-

ation is not a vehicle to make arguments or present evidence that should have been raised before. For example, as explained in § V(A)(2), the City did not advance its CERCLA § 101(9) arguments in its opposition, nor did it discuss its relevance to § 120(a)(4). In this Circuit, matters that were not presented in the first instance are not considered on a motion for reconsideration.[30]

 Here, the City has not presented any newly discovered and previously unavailable evidence.[31] It has not submitted any facts or law suggesting that there was "clear error of law" and the initial decision was manifestly unjust. This issue is not one of those narrow instances where it is appropriate to grant relief under Rule 59. The moving party must show more than a disagreement with the Memorandum Decision. Rule 59 motion are not granted unless there is need to correct a clear error of law or prevent manifest injustice. *Database Am., Inc. v. Bellsouth Adver. & Pub'g Corp.*, 825 F.Supp. 1216, 1220 (D.N.J.1993). The City has failed to set forth sufficient grounds to reconsider the April 22, 2010 Memorandum Decision.[32]

---

**30.** Assuming, *arguendo*, that the City satisfies its Rule 59 burden, its allegations do not connect its "facility" arguments to § 120(a)(4)'s remaining language, i.e., the City fails to explain how the United States' alleged downgradient contamination "operates" the OHF as that term is defined under CERCLA.

**31.** Even considering the City's arguments, it has not provided any authority to support its broad interpretation of § 120(a)(4), which is strictly construed in favor of the sovereign. *See, e.g., Gomez–Perez v. Potter*, 553 U.S. 474, 491–92, 128 S.Ct. 1931, 1943, 170 L.Ed.2d 887 (2008) (agreeing that a waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text and "will be strictly construed, in terms of its scope, in favor of the sovereign."). *Iqbal* requires a party to "plead[ ] *factual con-*

*tent* that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," not merely recite the relevant statutory language. —— U.S. ——, ——, 129 S.Ct. at 1949, 173 L.Ed.2d 868. The City's allegations did not, and do not, provide a plausible factual or legal connection between the United States' off-site operations and the targeted remediation on City-owned land.

**32.** The City also argues that the Court looked beyond the pleadings when it relied on the government's assertion that "the Corps remediated both [the AVCRAD and CANG] sites many years ago." The Memorandum Decision mistakenly referred to the government's assertion that it had previously remediated the AVCRAD/CANG property. However, this error did not change the sovereign immunity analysis under § 120(a)(4), i.e., whether the

The City's Rule 59(e) motion is GRANTED only to the extent the April 22, 2010, Memorandum Decision Granting the United States' Motion for Partial Judgment on the Pleadings as to the City's HSAA Claim is amended as described. Otherwise, the motion is DENIED.

## VI. CONCLUSION.

For the foregoing reasons:

1. The City of Fresno's motion to reconsider the April 22, 2010, Memorandum Decision Granting the United States' Partial Judgment on the Pleadings or for Partial Summary Judgment as to Plaintiff's Claim Under RCRA is DENIED.

2. The City of Fresno's Rule 59(e) motion is GRANTED only to the extent the April 22, 2010, Memorandum Decision Granting the United States' Motion for Partial Judgment on the Pleadings as to the City's HSAA Claim as described, otherwise, the motion is DENIED.

The United States shall submit a form of order consistent with, and within five (5) days following electronic service of, this memorandum decision.

IT IS SO ORDERED.

---

City sufficiently pled that the OHF/remediation site is a "federally operated facility" based on AVCRAD/CANG's presence. Accordingly, the Memorandum Decision Re: the United States' Motion for Partial Judgment on the Pleadings as to Plaintiff's Third Claim Under the HSAA (Doc. 143), filed April 22, 2010, is amended by:

1. Deleting at page 41, lines 6 through 9, the sentence "The United States also maintains that the property leased by the federal government—AVCRAD and CANG—was remediated, therefore the City did not incur any response costs on federal property."
2. Deleting at page 45, lines 1 through 3, the sentence "Second, it is/was impossible for the City to incur response costs at either AVCRAD or CANG because the Corps remediated both sites many years ago."
3. Deleting footnote 24, at page 45, in its entirety.

To the extent the City argues that the Court looked beyond the pleadings to resolve its § 120(a)(4) allegations, the motion is DENIED. As explained in the Memorandum Decision, a Court can consider documents attached to the Plaintiff's Complaint, documents incorporated by reference in the Complaint, and matters of judicial notice without converting the 12(c) motion into a motion for summary judgment. See, e.g., United States v. Ritchie, 342 F.3d 903, 908 (2003). Additionally, documents that were not attached to the City's second amended complaint, but were referred to extensively by the City and/or form the basis of the its claims, may be incorporated by reference. Id. Here, the United States' motion for judgment on the pleadings was not converted to a motion for summary judgment. No evidence was considered that requires converting the United States' motion for judgment on the pleadings to a motion for summary judgment.